Nicholas P. Roxborough
(SBN 113540)
David A. Carman
(SBN 150486)
Vincent S. Gannuscio
(State Bar No. 207396)
**ROXBOROUGH, POMERANCE, NYE & ADREANI LLP**
5820 Canoga Avenue, Suite 250
Woodland Hills, California 91367
Telephone:  (818) 992-9999
Facsimile:   (818) 992-9991

Attorneys for Plaintiff,
Pacific States Industries, Incorporated

# IN THE UNITED STATES DISTRTICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC STATES INDUSTRIES, INCORPORATED, a California corporation,<br><br>                                  Plaintiff,<br><br>vs.<br><br>AMERICAN ZURICH INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 50, inclusive,<br><br>                                  Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br>1. **Breach of Contract**<br>2. **Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing**<br>3. **Unfair Business Practices In Violation of** *Business & Professions Code §17200; and*<br>4. **Declaratory Relief**<br><br>**[JURY TRIAL DEMANDED]** |

PLAINTIFF, PACIFIC STATES INDUSTRIES, INCORPORATED

(hereinafter "PSI") hereby alleges against AMERICAN ZURICH INSURANCE

COMPANY ("ZURICH") and DOES 1 through 50, inclusive (collectively, hereafter

"Defendants"), as follows:

## THE PARTIES

1.    Plaintiff PACIFIC   STATES   INDUSTRIES,   INCORPORATED

("Plaintiff or PCI") is a corporation formed under the laws of the State of California,

1  with a principal place of business in Morgan Hill, CA, within this judicial district.

2      2.    Defendant AMERICAN ZURICH INSURANCE COMPANY is a
3  corporation formed under the laws of the State of Illinois and having a principal
4  place of business within that state. Zurich is specifically believed to do business in,
5  and does write workers compensation insurance policies, in the State of California.

6      3.    Plaintiff is unaware of the true names and capacities of those
7  Defendants sued as DOES 1through 50, and they are thus sued under such fictitious
8  names.  Plaintiff will amend this complaint to allege their true names and capacities
9  when ascertained.  Plaintiff is informed and believes, and thereon alleges, that each
10 of these fictitiously-named defendants is legally responsible in some manner for the
11 actions herein alleged, and that Plaintiff's damages were proximately caused by
12 their conduct.

13     4.    Plaintiff alleges that at all relevant times, Defendants, and each of
14 them, acted as the agent of every other Defendant, and in doing the things herein
15 alleged were acting within the course and scope of their authority.

16                    **JURISDICTION AND VENUE**

17     5.    Jurisdiction of this Court is invoked pursuant to *28 U.S.C. §1332(c)*,
18 based on diversity of citizenship.   The amount in controversy in this matter,
19 exclusive of interest and costs, exceeds the sum of $75,000.00, as more fully set
20 forth below.

21     6.    The contracts which are the subject of this action were entered into in
22 Santa Clara County, California, and a substantial part of the events and omission
23 giving rise to this claim occurred therein.   Venue is therefore proper within the
24 Northern District of California.

25                    **GENERAL ALLEGATIONS**

26     7.    Plaintiff alleges, on information and belief, that at all times relevant
27 hereto, ZURICH has been engaged in the business of writing workers compensation
28 insurance policies and has been qualified to do, and has been doing, business within

1  the State of California.

2      8.   PSI procured fourteen (14) consecutive sets of annual workers
3  compensation insurance policies from ZURICH incepting January 1, 2004, and
4  every January 1 thereafter, with the last policy incepting January 1, 2017
5  (collectively referred to as the "Policies").

6      9.   Each of the policies involved a high deductible in which PSI was
7  required to pay a $750,000 per claim deductible. These are known in the industry as
8  "Large Deductible" or "loss sensitive" policies.  Under this type of policy, PSI is
9  responsible to pay up to the first $750,000 of every workers compensation claim.

10     10.  The terms and conditions of the policy documents themselves were not
11 set forth in the policies themselves, but within a separate document, titled "Paid
12 Deductible Agreement, which was ultimately signed each year by the parties.  True
13 and correct copies of the Paid Deductible Agreement with attached specifications
14 for the years 2011-2017 are attached hereto as Exhibits "A" through "G".  PSI
15 intends to obtain remaining policy documents and agreements through discovery
16 and investigation in this matter.

17     11.  Under these Large Deductible policies, the manner in which the claims
18 are investigated, handled, and defended by Zurich, could adversely affect PSI.
19 Large Deductible policies are a form of policy known in the industry as "loss
20 sensitive".  These policies are, loss "sensitive" because, the amount of money that
21 Plaintiff is required to pay is directly related to the amount that Zurich estimates the
22 claims are going to cost and how much is actually paid out on a claim. In other
23 words, in addition to a fixed amount of premium that Zurich required Plaintiff to
24 pay, the amount of losses on each and every workers compensation claim, up to the
25 first $750,000, is ultimately the money of Plaintiff. Thus, the above policies are
26 hereinafter referred to collectively as "Loss Sensitive Workers Compensation
27 Policies."

28     12.  Under the Loss Sensitive Workers Compensation Policies, ZURICH

1  had a right and duty to defend PSI against any claim, proceeding, or suit brought
2  against it.  It is well established that a workers compensation insurer, such as Zurich,
3  "is obligated to give the interests of its insured at least as much consideration as it
4  gives its own interests." *See MacGregor Yacht Corporation v. State Compensation*
5  *Insurance Fund* (1998) 63 Cal.App.4th 448, 457.   Since PSI's Loss Sensitive
6  Workers Compensation Policies provided for a $750,000 per claim deductible,
7  making the first $750,000 of any claim the responsibility of PSI, ZURICH had a
8  contractual and fiduciary duty to ensure that PSI's claims were being properly
9  investigated, handled, and defended, according to the industry standards and
10 Zurich's own Best Practices.

11         13.  PSI alleges that, unlike any other type of insurance policy, the reserves
12 that workers compensation insurance carriers place on each individual claim, the
13 amount paid out under a claim, and the manner in which a claim is investigated,
14 handled, managed, and defended, inexorably controls the amount that PSI is
15 required to pay in premiums to ZURICH and to subsequent carriers, and how much
16 it pays on each claim up to its deductible.

17         14.  PSI is informed and believes, and thereon alleges, that (a) ZURICH
18 failed to properly reserve and/or reasonably audit the reserves on PSI's workers
19 compensation claims, resulting in excessive assessments/requests for collateral and
20 inflated premium charges; and, (b) ZURICH's inefficient handling of claims
21 resulted in PSI being charged higher premiums and excessive assessments/requests
22 for collateral, as described herein.

23         15.  PSI is informed and believes, and thereon alleges, that ZURICH sold
24 and marketed these policies to PSI based on fraudulent misrepresentation that
25 security for said claims, in the form of a Loss Fund or letter of credit (discussed
26 *infra*) deposited by PSI, was designed solely to ensure ZURICH would ask for and
27 hold only a reasonable amount of money necessary to cover the claims by PSI's
28 employees.  Upon information and belief, ZURICH's fraudulent scheme regarding

1  these deposits was directed not just at PSI but at each and every one of its insureds
2  who obtained a Loss Sensitive Workers Compensation Policy, as the fraudulent
3  terms concerning such securities are contained solely within the Paid Deductible
4  Agreement with attached specifications that, as described herein, were mostly, if not
5  entirely, illegal under California law.

6       16. Upon information and belief, ZURICH knew and intended that large
7  sums of unnecessary money or credit would be demanded and taken from these
8  insureds, not to ensure funds for payment of injured workers but to increase its own
9  available wealth and to punish those insureds who discontinued insurance programs
10  with Zurich, depriving PSI of the use of hundreds of thousands of dollars or more,
11  of its own money.   Upon information and belief, ZURICH knew or should have
12  known that PSI was completely unaware of the true purpose of these funds and that
13  PSI would think the excess monies were needed by ZURICH to only ensure
14  payment to injured workers.

15       17. Upon information and belief, ZURICH made these fraudulent
16  misstatements with the intent to induce PSI and its other insureds to enter into their
17  insurance contracts and execute Paid Deductible Agreements.  PSI reasonably and
18  justifiably relied on ZURICH's representations, and such reliance was detrimental to
19  PSI.

20       18.  ZURICH'S statements regarding its professional services were untrue
21  and misleading.  ZURICH knew these statements, or by the exercise of reasonable
22  care should have known, to be untrue and misleading.  As such, ZURICH's conduct
23  constitutes a violation of *California Bus. & Prof. Code §17500 et seq.*

24         **Zurich's Unlawful "Paid Deductible Agreements"**

25       19. *California Insurance Code §11658* mandates that a workers
26  compensation insurance policy or endorsement shall not be issued by an insurer to
27  any person in this state unless the insurer files a copy of the form or endorsement
28  with the California Workers Compensation Insurance Rating Bureau ("WCIRB")

1  pursuant to *California Insurance Code §11750.3(e)*.  California courts have ruled

2  unequivocally that "side agreements" such as ZURICH's "Paid Deductible

3  Agreements" are insurance policy documents and thus subject to this requirement.

4  *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.4[th] 1096

5  (refusing to enforce arbitration provision in an unfiled side agreement similar to that

6  used by ZURICH).

7      20.  Further, *10 California Code of Regulations 2268* specifically states that

8  no collateral agreements modifying the obligations of either the insured or insurer

9  shall be made unless "attached to and made a part of the policy, provided, however,

10 that if such agreements are attached and in any way restrict or limit the coverage of

11 the policy, they shall conform in all respects with these rules."

12      21.  PSI is informed and believes and thereon alleges that prior to July,

13 2013, ZURICH did not submit its Paid Deductible Agreements to the WCIRB as

14 required by the above authorities.  This illegal practice harmed California insureds

15 in that this Agreement, which governed ZURICH's practices with respect to.

16 Amongst other things, setting collateral was not subjected to scrutiny by those

17 California regulators who were statutorily given the responsibility of protecting such

18 insureds.   Furthermore, the Paid Deductible Agreements contained numerous

19 onerous terms, including providing for the application of New York law to any

20 disputes between the parties (New York law does not provide the same protections

21 for workers compensation insureds as does California) and requiring the arbitration

22 of any disputes, and that such arbitration would take place in Schaumburg, Illinois,

23 denying California insureds the right to bring an action in court, in California,

24 should ZURICH breach its obligations.

25      22.  The Department of Insurance, in a 2016 precedential administrative

26 decision, has declared similar unfiled side agreements to be *void* and unenforceable

27 as a matter of law. See: *In the Matter of the Appeal of Shasta Linen Supply, Inc.*

28 *From the Decision of the California Insurance Company*, DOI Case Number AHB-

1  WCA-14-31.

2       23. Specific to Zurich, in February, 2012, the California Department of
3  Insurance ("CDI") brought a regulatory action against ZURICH seeking to prevent
4  further violations of the Insurance Code and regulations.  The ultimate result of this
5  regulatory action was a settlement agreement entered into on or about July 11, 2013
6  (a true and correct copy attached hereto as Exhibit "H").   In that settlement
7  agreement, ZURICH agreed that it would not issue or amend any Paid Deductible
8  Agreement unless and until its form was submitted to and approved by the WCIRB
9  and CDI.

10      24. The settlement agreement further provided that with respect to
11 agreements used prior to the settlement, ZURICH would waive application of New
12 York law and would waive the requirement that arbitrations take place in
13 Schaumburg, Illinois.  The agreement provided that California law would apply to
14 any disputes under such Deductible Agreements.  After this settlement, a court in
15 the Central District of California found an "Incurred Deductible Agreement" very
16 similar to that in the present case to be "illegal under Section 11658", "void as a
17 matter of law, and unenforceable in their entirety." *American Zurich Ins. Co. v.*
18 *Country Villa Service Corp.*, 2015 WL 4163008 (C.D. CA 2015)(unreported in
19 F.Supp.3d)

20      25. Accordingly, all Paid Deductible Agreements entered into between
21 ZURICH and PSI that were not submitted to the WCIRB in accordance with *Ins.*
22 *Code §11658,* in particular all policies incepted prior to July, 2013, are void and
23 unenforceable as a matter of law.  All provisions of such agreements, including
24 collateral requirements, provision of New York law, and arbitration of disputes,
25 have been invalidated as a result of the above settlement agreement and decisions of
26 the state and federal district court.

27

28

### Zurich's Punitive Use of Its Collateral Requirements

26.     The Paid Deductible Agreements gave Zurich the right to set the amount of collateral required to secure PSI's obligations to its employees under its workers compensation policies.  The Paid Deductible Agreements defined collateral as a "financial instrument provided by You to secure the deferral of Your financial obligations under the Program".  As noted above, the amount required under these Agreements is affected by the manner in which ZURICH handles and administers PSI's workers compensation claims.

27.  As required by law, ZURICH creates what are called "Claim Reserves" on the claims that are opened.  Claim Reserves are an amount of money set aside to meet reasonably anticipated future payments associated with claims incurred but not yet settled or resolved.  The reserves are set by ZURICH based upon an experienced adjuster's analysis of the amount of money that ultimately will be needed to be spent on the open claims.

28.  In addition to the Case Reserves, the Paid Deductible Agreements also call for imposition of an Allocated Loss Adjustment Expense ("ALAE") which serves to adjust upward the amount that would be owed to ZURICH by PSI.  The ALAE is set using the application of a Loss Development Factor ("LDF"), which is an amount set solely at the discretion of ZURICH to cover claims it believes to have been incurred but not yet reported (commonly referred to in the industry as "IBNR's"), and anticipated future changes in losses on claims already reported.

29.  The Paid Deductible Agreements, therefore, give ZURICH the ability to manipulate future collateral requirements simply by the manner in which it sets Case Reserves, handles claims, and applies its LDF.

30.  Prior to January 1, 2018, PSI was required to secure its obligations through use primarily of a Letter of Credit ("LOC"), the amount of which determined by ZURICH.  The amounts of the ("LOC") required by ZURICH over the years prior to termination were as follows:

| | | |
|---|---|---|
| 1 | 2011: | $2.6 million |
| 2 | 2012: | $2.45 million |
| 3 | 2013: | $2.45 million |
| 4 | 2014: | $2.8 million |
| 5 | 2015: | $2.9 million |
| 6 | 2016: | $3.4 million |
| 7 | 2017: | $3.775 million |

31. At all material times, PSI was current in paying its losses as they were incurred and billed by ZURICH. Thus, it was never necessary for ZURICH to make use of any collateral to pay claims (i.e., to "draw down" on the LOC to fund the claims).

32. Prior to January 1, 2018, ZURICH offered to renew PSI's policy for the period January 1, 2018-December 31, 2018. In so doing, it proposed an increase in the Letter of Credit of $150,000 to secure anticipated future losses.

33. During this time period, however, PSI was becoming increasingly frustrated at the increasing reserves under its policy, which were the result of improper claims handling as described herein by ZURICH. Additionally, there have been a high turnover of claims examiners on PSI's claim files and indeed, Zurich's last claims professional that was assigned to PSI's account was inexperienced. By approximately 2017, PSI was paying ZURICH at this time over $100,000 per month in loss reimbursements, and its collateral requirement increasing exponentially as indicated in paragraph 29. As such, PSI determined that it would not renew with ZURICH for 2018.

34. Despite not renewing, PSI still maintained an obligation to pay losses under the ZURICH policies and provide collateral for same (including collateral under Paid Deductible Agreements prior to July, 2013). Indeed, at all times, PSI maintained its obligation to pay losses under the ZURICH policies and continues to pay such losses as they are billed.

35. Between 2004 and 2017, ZURICH benefitted from the relationship between the parties in that it had obtained from PSI millions of dollars in premiums and ancillary charges such as bill review. However, after ZURICH was informed of the non-renewal, it took immediate steps to punish PSI for ending the business relationship. ZURICH demanded additional collateral not of $150,000 as previously proposed, but of over $1 million. This demand was made, not because there had been any material increase in PSI's losses or anticipated future losses but instead was in retaliation, <u>and an intent</u> to penalize PSI for its non-renewal. In other words, Zurich claimed it needed only an additional $150,000 in collateral to take on another year's worth of risk. But, if no further risks were being imposed on Zurich, other than what previously existed, Zurich was now claiming it needed over $1 million to secure liabilities from prior policies.

35. When PSI balked at making a payment in excess of $1 million, ZURICH responded by "offering" to decrease its demand for additional collateral to $500,000. Again, no explanation was provided as to why any additional collateral was needed, let alone the $150,000 proposed prior to the non-renewal.

36. When PSI declined to pay the inflated $500,000 in additional collateral, it was sent a letter dated June 26, 2018 from an attorney representing ZURICH, demanding payment of additional collateral in the amount of $1,078,819 by July 6 (a true and correct copy of the letter is attached as Exhibit "I"). The letter further threatened that if PSI did not pay, then ZURICH would initiate arbitration "in accordance with the terms of the insurance program", even though such an action in this case would violate the terms of California law and of ZURICH's settlement agreement with the Department of Insurance.

## FIRST CAUSE OF ACTION

### (For Breach of Contract Against All Defendants)

37.     Plaintiff incorporates herein by this reference all of the allegations of paragraphs 1 through 36 as though fully set forth in this cause of action.

38.     ZURICH, in each of the workers compensation policies between it and PSA, undertook the right and duty to defend PSI's workers' compensation claims. ZURICH further promised that it had the right to investigate and settle these claims. Pursuant to the policies and the Paid Deductible Agreements, ZURICH's duties included, among other things, the following:

A.     To investigate all qualified claims and losses to the extent deemed necessary, and to adjust, settle, defend, and otherwise properly handle all such claims or losses;

B.     Create and maintain a claim file and document the claim file appropriately regarding plans of actions;

C.     To train and hire experienced adjuster's and claims supervisors and monitor the work performed by them;

D.     To create and apply collateral requirements designed sole to ensure payment of PSI's obligations under its policies pursuant to the Paid Deductible Agreement.

39.     Plaintiff has performed all material covenants and conditions under its contracts with ZURICH, except for those terms where performance was excused by ZURICH's misconduct.

40.     ZURICH breached its contractual requirements by:

A.     ZURICH failed to properly reserve and/or audit the reserves on PSI's workers compensation claims, resulting in excessive assessments/requests for collateral and inflated premium charges;

B.      ZURICH's inefficient and/or substandard handling of claims resulted in PSI being charged higher premiums and excessive assessments/requests for collateral;

C.      ZURICH failed to properly train and supervise its claims personnel, breaching its duty to reasonably and adequately defend PSI's workers' compensation claims;

D.      ZURICH made unreasonable and excessive demands for collateral not based on a reasonable evaluation of current losses or any reasonable estimate of future losses, but rather as an attempt to punish PSI for its non-renewal.

40.     Plaintiff is further informed and believes, and thereon alleges, that ZURICH has committed further acts and omissions violating its duties under the workers compensation policies and Paid Deductible Agreements which are presently unknown to Plaintiff and may be discovered in the course of this litigation.  Plaintiff will request leave of court to amend this complaint to allege further breaches on the part of ZURICH as they are learned through the course of investigation and discovery.

41.     As a proximate result of ZURICH's breaches discussed herein, Plaintiff has suffered general and special damages in an amount within the jurisdictional limit of this court.  Such damages include, but are not limited to, paying ZURICH for excessive losses due to the improper claims handling discussed herein and excessive collateral paid to ZURICH to cover losses due to improper claims handling.  Plaintiff has also been forced to retain the services of attorneys, and pay them a reasonable fee, to procure the benefits due them under its policies of insurance.  Such losses are in an amount according to proof at the time of trial but greatly exceed the $75,000 jurisdictional minimum of this court.

## SECOND CAUSE OF ACTION

**(For Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against All Defendants)**

42.     Plaintiff incorporates herein by this reference all of the allegations of paragraphs 1 through 36 as though fully set forth in this cause of action.

43.     The covenant of good faith and fair dealing is implied by law in every contract to protect each party's right to receive benefits of a contract, in this case the benefits to PSI contained in the Loss Sensitive Workers' Compensation Policies. Particularly, the duty of good faith and fair dealing requires ZURICH to reasonably and adequately investigate and defend PSI and to oversee and audit the claims handling of its adjusters and other claims personnel, as alleged hereinabove.  In addition, that duty involves demanding only those funds for the Loss Fund which are proper and reasonably necessary.

44.     Instead, ZURICH has undertaken the activities and conduct described hereinabove knowing that it unlawfully attempting to enforce un-filed side agreements that are void and unenforceable pursuant to its settlement with the DOI, the ruling in *Shasta Linen* and the ruling against ZURICH and the *Country Villa* and *Nielsen* decisions, described in detail hereinabove.

45.     Further, ZURICH and its corporate officers and directors have undertaken this activity with the full intent of trying to leverage a California employer, such as PSI into providing it with an unreasonable amount of collateral for punitive purposes.  Plaintiff is informed and believes and thereon alleges that one of the reasons for Zurich wanting additional collateral has little or nothing to do with the financial solvency of PSI. In fact, PSI's financial solvency is greater today than it was several years ago, when it was insured under the aforementioned Policies. Instead, Plaintiff is informed and believes that Zurich seeks this additional collateral to show greater profitability on its financial documents, creating an artificial amount of "surplus" on its financial statements.

1      46.    At the time of making its demand and threatening to sue PSI for

2  additional collateral, ZURICH failed to give equal consideration to the interest of

3  PSI compared to those unique financial benefits for its own financial well-being it

4  would have garnered had PSI complied with its unreasonable demand.  Because of

5  this, and as a result of engaging in the conduct herein described, ZURICH has

6  denied Plaintiff the benefits of the Loss Sensitive Workers Compensation Policies,

7  and thus has breached the implied covenant of good faith and fair dealing.

8      47.    ZURICH further created and manipulated its Loss Development

9  Factors on Plaintiff's program, in an improper manner and in violation of its duties

10  set forth above, and applied them punitively and unreasonably against PSI after it

11  refused to renew its workers compensation policy for 2018.

12      48.    As a result of the conduct set forth in this complaint, ZURICH has

13  breached the implied covenant of good faith and fair dealing by having engaged in,

14  and continuing to engage in, the following acts and/or omission which are implied

15  under the Loss Sensitive Workers' Compensation Policies:

16      A.    Failing and/or refusing to reasonably investigate the compensability

17             and/or nature and extent of Plaintiffs' claims;

18      B.    Failing to accurately and reasonably set reserves;

19      C.    Failing to reasonably manage and adjust claims, resulting in

20             overpayment of claims and not pursuing defenses that could reasonably

21             have lessened PSI's losses;

22      D.    Failing to proper train and monitor claims handling personnel;

23      E.    Demanding from PSI an amount of collateral that was improper and

24             unreasonable;

25      F.    Seeking to enforce against Plaintiff dispute resolution clauses,

26             collateral clauses and other terms in unfiled side agreements with full

27             knowledge that such terms are illegal and unenforceable as a matter of

28             law.

49. PSI is informed and believes, and thereon alleges, that ZURICH is aware of the extent to which PSI's claims were mishandled, overpaid, and over-reserved in such a way as to artificially increase its losses.

50. Plaintiff is further informed and believes, and thereon alleges, that ZURICH has committed further acts and omissions violating its duty of good faith and fair dealing which are presently unknown to Plaintiff and may be discovered in the course of this litigation. Plaintiff will request leave of court to amend this complaint to allege further breaches on the part of ZURICH as they are learned through the course of investigation and discovery.

51. As a proximate result of ZURICH's conduct as described hereinabove, Plaintiff has suffered general and special damages in an amount above the jurisdictional limit of this court. Such damages include, but are not limited to, paying ZURICH for excessive losses due to the improper claims handling discussed herein and excessive collateral paid to and held by ZURICH to cover losses due to improper claims handling and improper collateral demands. Plaintiff has also been forced to retain the services of attorneys, and pay them a reasonable fee, to enforce the benefits due them under its policies of insurance. Such losses are in an amount according to proof at the time of trial but greatly exceed the $75,000 jurisdictional minimum of this court.

52. The conduct of ZURICH set forth above, particularly its manipulation of LDFs and demands for collateral and its implementation of a more worse case reserving standard, all of which was undertaken in retaliation for Plaintiff refusing to renew with Zurich for a fifteenth year, was carried out in bad faith, was malicious, fraudulent, and oppressive, and evidences a complete disregard of PSI's interests and legal rights. Such conduct was intended to injure, harass, vex and annoy PSI. ZURICH's conduct therefore constitutes "despicable conduct" within the meaning of *California Civil Code §3294* and established common law, and thus

1  warrants the imposition of punitive damages against all Defendants in an amount
2  appropriate to punish Defendants and to deter future unlawful conduct.

3

4  ### THIRD CAUSE OF ACTION

5  **(Violation of *Bus. & Prof. Code §17200 et seq.* Against All Defendants)**

6  53.   Plaintiff incorporates herein by this reference all of the allegations of
7  paragraphs 1 through 52 as though fully set forth in this cause of action.

8  54.   PSI has standing to bring this action pursuant to *California Business*
9  *and Professions Code §17204* as it has suffered an injury in fact and has lost money
10  and/or property as a result of Defendants' unfair business practices.

11  55.   Defendants marketed the policies and Paid Deductible Agreements as
12  Loss Sensitive Workers' Compensation Policies by representing to PSI that the
13  collateral being requested would be used exclusively to ensure payment of workers
14  compensation claims, and that ZURICH would seek only such collateral as would
15  be reasonably necessary to pay those claims.  At no time was PSI ever advised that
16  ZURICH intended to improperly handle claims so as to artificially inflate the
17  amount of collateral required, nor was it advised that such collateral would ever be
18  artificially inflated as punishment and in retaliation for non-renewal.

19  56.   Further, Defendants are seeking to enforce side agreements and
20  provisions, including arbitration and choice of law provisions, which it knows are
21  illegal and unenforceable under California law.

22  57.   Defendants' practices described herein constitute an unlawful business
23  practice which violates *Bus.& Prof. Code §17500* (False and Misleading
24  Statements) and *Civil Code §3336 (*conversion), among other laws.  Such practices
25  are also unfair and fraudulent.

26  58.   As a proximate result of the aforementioned unlawful, unfair, and
27  fraudulent business practices, Defendants have garnered illicit profits at the expense
28  of PSI and other similarly situated insureds.  Plaintiff brings this action seeking

1  equitable and statutory relief to stop the misconduct of Defendants as complained

2  herein, and to compel payment of restitution by Defendants of all sums acquired as a

3  result of the unfair, unlawful, and fraudulent business practices described in this

4  complaint.

5      59.    The willful and knowing conduct of Defendants as alleged herein

6  constitutes unfair, unlawful, and/or fraudulent business practices as set forth in *Bus.*

7  *& Prof. Code §§17200-17208.*

8      60.    Pursuant to *Bus. & Prof. Code §17203*, PSI seeks an order of restitution

9  of all money lost due to the unlawful, unfair, and fraudulent business practices of

10  ZURICH, in an amount to be proven at the time of trial.

11      61.    PSI further seeks a permanent injunction, pursuant to *Bus. & Prof.*

12  *Code §17203*, enjoining Defendants from continuing to engage in the willful,

13  unlawful, unfair, and fraudulent business practices as alleged herein, including an

14  injunction against ZURICH's continued enforcement, or attempts to enforce, its un-

15  filed agreements, which are void and unenforceable as a matter of law.

16

17  **FOURTH CAUSE OF ACTION**

18  **(Declaratory Relief Against All Defendants)**

19      62.    Plaintiff incorporates herein by this reference all of the allegations of

20  paragraphs 1 through 52 as though fully set forth in this cause of action.

21      63.    An actual controversy has arisen between Plaintiff and Defendants

22  regarding their rights and duties under the Loss Sensitive Workers' Compensation

23  Policies.

24      64.    Plaintiff, on the one hand, contends as follows:

25      A.    That the Paid Deductible Agreements and attached specifications prior

26          to July, 2013 are void and unenforceable as a matter of law because the forms

27          of such agreements were not filed with the WCIRB prior to being sold to

28          Plaintiff;

- 17 -
**COMPLAINT**

B.     That the arbitration venue and choice of law provisions of such agreements are unenforceable pursuant to California law, Country Villa,  and the settlement agreement between ZURICH and the Department of Insurance;

C.     That ZURICH is not entitled to arbitration of the present dispute, which involves collateral for claims including claims arising under policies and Paid Deductible Agreements issued prior to July, 2013;

D.     That California, rather than New York, law applies to the present dispute, which involves collateral for claims including claims arising under policies and Paid Deductible Agreements issued prior to July, 2013.

E.     That ZURICH is not entitled to $1,078,819 in collateral as demanded, and that actually Zurich is either adequately collateralized for all of its anticipated losses, and/or that Zurich should make a partial refund of the collateral it currently holds.

65.     Plaintiff is informed and believes, and thereon alleges, that ZURICH disputes each of these points, contends that it may arbitrate the present dispute in Schaumburg, Illinois applying New York law, and that it is entitled to $1,078,819 in collateral, plus interest and attorney's fees as claimed by its attorney.

66.     Plaintiff seeks and is entitled to a judicial declaration and determination of the rights and duties of itself and ZURICH under the Loss Sensitive Workers Compensation Policies.  A declaration of the rights and duties of these parties is necessary to resolve the present dispute and provide a judicial determination for future cases, thereby avoiding redundant litigation, preserving court and party resources, and streamlining litigation.

WHEREFORE, Plaintiff prays for entry of judgment as follows:

**On the First Cause of Action**

1. For damages in an amount according to proof but not less than $75,000, plus prejudgment interest;

2. For attorney's fees;

3. For costs of suit incurred herein;

4. For such other and further relief as this court deems just and proper.

**On the Second Cause of Action**

1. For damages in an amount according to proof but not less than $75,000 plus prejudgment interest;

2. For attorney's fees;

3. For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar wrongful conduct;

4. For costs of suit incurred herein;

5. For such other and further relief as this court deems just and proper.

**On the Third Cause of Action**

1. For restitution pursuant to *Bus. & Prof. Code §17203;*

2. For injunctive relief pursuant to *Bus. & Prof. Code §17203*

3. For attorney's fees;

4. For costs of suit incurred herein;

5. For such other and further relief as this court deems appropriate.

**On the Fourth Cause of Action**

1. For a declaration of the rights and obligations of the parties under the Loss Sensitive Workers Compensation Policies;

2. For costs of suit incurred herein; and

3. For such other and further relief as this court deems just and proper.

DATED:  July 6, 2018      ROXBOROUGH, POMERANCE, NYE & ADREANI LLP

                                        */s Nicholas P. Roxborough*
                          By:‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
                                NICHOLAS P. ROXBOROUGH
                                DAVID A. CARMAN
                                VINCENT S. GANNUSCIO
                                Attorneys for Plaintiff
                                Pacific States Industries, Inc.

**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff PACIFIC STATES INDUTRIES, Inc. hereby demands a jury trial.

3

4   DATED:  July 6, 2018        ROXBOROUGH, POMERANCE, NYE & ADREANI

5                               LLP

6

7                                         */s Nicholas P. Roxborough*
                               By:_____

8                                         NICHOLAS P. ROXBOROUGH
                                          DAVID A. CARMAN
9                                         VINCENT S. GANNUSCIO
10                                        Attorneys for Plaintiff
                                          Pacific States Industries, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2011, between Pacific States Industries, Inc. referred to as "You" and "Your" and American Zurich Insurance Company referred to as "We," "Us" and "Our".

## TERMS AND CONDITIONS

### A. Purpose of the Agreement

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

### B. Scope of the Agreement

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications.  Each part of the Agreement will be signed by both parties.  The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program and supersedes any Deductible endorsements to the Policy(ies), prior communications, negotiations, participating plans or letters of election.

### C. Program Description

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications.  You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

You assume the risk within the Deductible Amount(s) and We accept the risk transfer excess of the Deductible Amount(s) and the Aggregate Deductible, if applicable, up to the limits of liability under the Policy(ies).  You pay Us for Our assumption of this obligation and for Our expenses.

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral.  The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

### D. Program Structure

The Program has two primary, independent components: (1) the insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

If You Default, We may, at Our option, terminate the financing arrangements under the Program. This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

**E. Definitions**

1. **Allocated Loss Adjustment Expense ("ALAE")** is an expense directly allocable to a specific claim and shall include but not be limited to all Supplementary payments as defined under the Policy(ies); all court costs, fees and expenses; all costs, fees and expenses for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, non-employee adjusters, medical examinations, autopsies, medical cost containment; declaratory judgment, subrogation and any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the Policy(ies).

2. **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3. **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4. **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program. We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

5. **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies) as stated in the Specifications.

6. **Deductible Premium** is the amount paid by You to Us for the Program.

7. **Default** occurs when

   a. You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,

   b. You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You,

   c. You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8. **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9. **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us. How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges** shall include, but are not limited to, additional taxes, additional Premium Surcharges, additional premium and loss assessments, and administrative, statutory or court-ordered fines or penalties not the result of Our negligence. Other Special Charges shall also include any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this Agreement.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies). Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** include current, new or modified premium surcharges and assessments levied by federal, state, city, municipal or other governmental agencies or as required by regulation or statute which are due and adjusted as stated in the Specifications. New premium surcharges and assessments are those levied after the Specifications Effective Date. Modified premium surcharges and assessments are those whose rate or computation base changes after the Specifications Effective Date.

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds. The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable. With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim. The ULAE may be charged to You either by applying: (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

## F.  Payments Due

The payments under this Program and the dates these amounts become due are stated in the Specifications. Each party to the Agreement agrees to remit all payments so that they are received on or before the due date. If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date. You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

## G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications. We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually. The formula for adjustment of the Loss Fund amount is stated in the Specifications.

## H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us. The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank").

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

      The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement. Collateral requirements will be reviewed periodically and We reserve the right to adjust Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it is adjusted are stated in the Specifications. You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

      Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, delivery of other than New York Insurance Department approved wording, etc. shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

      If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

      If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC. You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15)

days prior to its expiration date, whichever is sooner. The LOC must be in the form provided by Us.

3. Draws on Collateral

In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

a. Any amount that is due or may become due under this Agreement;

b. Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

c. Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4. Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required. You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

### I. Audit

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies). The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

### J. Invalidity and Severability

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision. The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

### K. Non-Waiver of Rights

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement. The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

### L. Changes in this Agreement

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

### M. Offset

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

## N. Reliance on Others

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should be considered to constitute such advice. You further represent that if accounting advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

## O. Arbitration

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1. Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA. The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2. A panel shall be made up of three arbitrators. Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3. If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4. If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association. At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5. Unless the parties under this Agreement agree otherwise, arbitration shall take place in Schaumburg, Illinois.

6. The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement. Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages. Confirmation of the award may be entered in any court having jurisdiction.

7. Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses). Each party shall pay its own costs of counsel and witnesses.

## P. Termination

This Agreement will terminate by mutual written consent. We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled. Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination. It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the

right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, the Agreement will follow the cancellation provisions of the Policy(ies), subject to the minimum amounts for the Deductible Premium and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your financial condition, We may, at Our option, terminate the financing portion of the Program. The amount immediately due and payable to Us will be determined by Us using either of the following options: (1) all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; or, (2) the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

## Q. Governing Law And Jurisdiction

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its choice of law doctrine.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

PACIFIC STATES INDUSTRIES, INC.           AMERICAN ZURICH INSURANCE COMPANY

By: _Curtis Varlus_                        By: _Gail W. Sydow_

Title: _VP/CFO_                            Title: _VICE PRESIDENT_

Witness: _____                  Witness: _Marisa Young_

Date: _2-22-11_                            Date: _1-10-2011_

**Large Risk Rating Option**
**Terrorism Risk Insurance Act Election (TRIA)**
**and**
**Domestic Terrorism, Earthquakes and Catastrophic**
**Industrial Accidents Election  (DTEC)**
**WC Deductible**

This agreement is executed because you chose to have the cost of your insurance rated on this basis.

As agreed upon by the Insured and the Carrier, the LRRO Premium Factors are included below.

LRRO Premium Factor - by state:

| | TRIA Factor | DTEC Factor | | TRIA Factor | DTEC Factor |
|---|---|---|---|---|---|
| Alabama | | | Mississippi | | |
| Alaska | | | Missouri | | |
| Arkansas | | | Montana | | |
| California | 0.540084 | 0.540084 | Nebraska | | |
| Colorado | | | Nevada | | |
| Delaware | | | New Hampshire | | |
| District of Columbia | | | New Mexico | | |
| Idaho | | | North Carolina | | |
| Illinois | | | Oklahoma | | |
| Indiana | | | Pennsylvania | | |
| Iowa | | | Rhode Island | | |
| Kentucky | | | South Carolina | | |
| Louisiana | | | South Dakota | | |
| Maine | | | Utah | | |
| Maryland | | | Vermont | | |
| Michigan | | | Virginia | | |
| Minnesota | | | West Virginia | | |

Policy Number(s):  WC 8298292-07                          Policy Term: 01/01/2011 - 01/01/2012

First Named Insured Signature:        Pacific States Industires, Inc.

Title:    _VP/CFO_ _____ Date: _____

Carrier:   American Zurich Insurance Company, Inc.  /Marcia Young

Title:    Senior Account Executive      Date: _____

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT
BETWEEN
PACIFIC STATES INDUSTRIES, INC.
AND
AMERICAN ZURICH INSURANCE COMPANY ("AZIC")**

**Specifications Effective Date: January 01, 2011**

**A. Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|---|---|---|---|
| WC | AZIC | WC 82 98 292 - 07 | 01/01/2012 |

**B. Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1. The first $750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2. The first $750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3. The first $750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4. The first $750,000under EL coverage arising out of occupational disease payable to each affected employee.

5. With respect to 1through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

   ALAE is included within the Deductible Amount under the Policy and is reimbursed to Us by You up to the Deductible Amount. We pay the ALAE excess of the Deductible Amount.

**C. Deductible Premium**

You are obligated to pay Us Deductible Premium. The Deductible Premium deposit and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill. In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll including stop gap | $2.201443 per $100 | 11,850,000 | $260,871 | $260,871 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1.  You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2.  Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3.  Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

    a.  The WC Terrorism Premium is not included in the WC premium or the WC rate stated elsewhere in these Specifications and is subject to audit.

4.  CAT Premium applies with respect to WC Policy(ies) only.  CAT Premium will be adjusted by Us at the time We issue the premium audit bill.  CAT Premium is not included in the WC premium or the WC rate stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1.  The Aggregate Deductible is an estimated amount of $4,000,000.

2.  The Aggregate Deductible will be adjusted by Us at a rate of $33.755274 per $100 of audited payroll including stop gap at the time we issue the premium audit bill.

3.  In no event will the Aggregate Deductible be less than $4,000,000.

4.  The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or Incurred Losses within the Deductible Amount plus applicable Incurred ALAE should the Loss Billings convert, shall be no greater than the Aggregate Deductible.

5.  Your obligation to pay Us for LCF and LBAs on Paid Losses within the Deductible Amount plus applicable Paid ALAE, or Incurred Losses within the Deductible Amount plus applicable Incurred ALAE should the Loss Billings convert, is in addition to the Aggregate Deductible amount.  Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount.

**F. Loss Based Assessments (LBAs)**

You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until all losses have been paid or We suspend Loss Billings.

| State | Rate |
|-------|------|
| DC | 0.152 |
| IL | 0.007 |
| KS | 0.038 |
| ME | 0.008 |
| MI | 0.006 |

## G. Unallocated Loss Adjustment Expense (ULAE)

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing | Converted Loss Billing |
|-------------|--------|--------------------|------------------------|
| WC/EL | 1.1100 | Paid Loss & Paid ALAE | Incurred Loss & Incurred ALAE |

## H. Loss Billings

You are obligated to pay Us all Loss Billings.

You will be billed monthly following the effective date of the Deductible Policy, for the following:

1. Paid Losses within the Deductible Amount plus applicable Paid ALAE paid during the month,
2. less Recoveries within the Deductible Amount(s) credited during the month,
3. times the LCF,
4. plus WC Paid Losses within the Deductible Amount paid during the month times the state LBA.

Loss Billing payments will be withdrawn from Your bank account by Us as authorized by You under the Electronic Funds Transfer (EFT) Agreement. Each Loss Billing transaction will take place on the 15th of the month to reimburse Us for the prior month's Losses. If the 15th is a non-business day, we will withdraw the funds on the following normal business day.

We will not delay the drawing out of funds due to an individual Claim or Loss dispute. We will either withdraw all Losses not in dispute or withdraw the full amount and any reconciliation of the Losses that may be necessary will be recognized and adjusted for in the subsequent month's transaction.

Loss Billings shall continue until either i) We suspend billings when all losses have been paid or ii) the conversion of the Loss Billings resulting in an alternate method of payment as may be provided for in the Loss Billing Conversion section of these Specifications.

## I. Loss Billing Conversion

1. Beginning sixty-six (66) months after the Specifications Effective Date, converted Loss Billings will begin. You are obligated to pay Us all converted Loss Billings.
2. At the time of conversion and, at a minimum, annually thereafter, We will bill You:
   a. Incurred Losses within the Deductible Amount, plus applicable Incurred ALAE,
   b. times the LCF,
   c. plus WC Incurred Losses within the Deductible Amount times the state LBA,
   d. less Loss Billings by Us.
3. Loss Billings shall continue until We suspend billings when all losses have been paid.

**J. Premium Surcharges and Other Special Charges**

1. Premium Surcharges

   You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium. This sum is payable to Us as stated in the Policy.

   You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy.  Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

   You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2. Other Special Charges

   You are obligated to pay Us for Other Special Charges.  You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law.   We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.  You will be billed based upon the information provided.

**K. Loss Fund**

| | |
|---|---|
| Loss Fund on Hand | $ 84,000 |
| Adjustment: | $ 20,664 |
| Required/Amended Loss Fund amount: | $104,664 |

1. You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2. Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.  We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above.  Adjustments will be calculated and billed as follows:

   a. Paid Losses within the Deductible Amounts and applicable Paid ALAE for 12 months prior to the adjustment date,
   b. times the LCF,
   c. plus WC Paid Losses within the Deductible Amount times the applicable state LBA,
   d. divided by 12 equals the monthly average payment,
   e. monthly average payment times 1.0 equals the adjusted Loss Fund,
   f. Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3. At the time of each Loss Fund adjustment, payment by You must be deposited to the EFT due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings.  When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

## L.  Collateral

| Collateral on hand: | $2,550,000 |
|---|---|
| Adjustment: | $   50,000 |
| Required/Amended Collateral amount: | $2,600,000 |

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1.  Incurred Losses within the Deductible Amounts plus applicable Incurred ALAE,
2.  times the applicable LDF,
3.  times the LCF,
4.  plus the applicable LBA,
6.  less the sum of amounts billed by Us for Loss Billings.

For the Policy stated in these Specifications, LDFs used by Us to compute Your Required/Amended Collateral obligation will be determined by Us, at our sole discretion, at the time of each Collateral adjustment.

## M.  Notices

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc.
                  Attn: Mr. Austin L. Vanderhoof – Executive VP

Address:   2 W Santa Clara Street, 9th FL
                  San Jose, CA 95113-1807

Telephone:408 271 7900

Telefax:    408 271 7911


If to Us:     American Zurich Insurance Company

                  Attn: Ms. Gail Sydow, Account Manager & VP

Address:   560 Mission Street, 23 FL

                  San Francisco, CA 94105


Telephone:415 538 7246

Telefax:    415 538 7252

The parties have caused the Specifications, effective January 01, 2011 to be signed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**

By: _Crystal Varluten_

Title: _VP/CFO_

Witness: _____

Date: _2-22-11_

**AMERICAN ZURICH INSURANCE COMPANY**

By: _Dail W. Sydow_

Title: _VICE PRESIDENT_

Witness: _Maria Young_

Date: _1-10-2011_

# EXHIBIT "B"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2012, between Pacific States Industries, Inc. referred to as "You" and "Your" and American Zurich Insurance Company referred to as "We," "Us" and "Our".

## TERMS AND CONDITIONS

### A. Purpose of the Agreement

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

### B. Scope of the Agreement

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications. Each part of the Agreement will be signed by both parties. The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program and supersedes any Deductible endorsements to the Policy(ies), prior communications, negotiations, participating plans or letters of election.

### C. Program Description

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications. You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

You assume the risk within the Deductible Amount(s) and We accept the risk transfer excess of the Deductible Amount(s) and the Aggregate Deductible, if applicable, up to the limits of liability under the Policy(ies). You pay Us for Our assumption of this obligation and for Our expenses.

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral. The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

### D. Program Structure

The Program has two primary, independent components: (1) the insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

If You Default, We may, at Our option, terminate the financing arrangements under the Program.  This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

## E.  Definitions

1. **Allocated Loss Adjustment Expense ("ALAE")** is an expense directly allocable to a specific claim and shall include but not be limited to all Supplementary payments as defined under the Policy(ies); all court costs, fees and expenses; all costs, fees and expenses for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, non-employee adjusters, medical examinations, autopsies, medical cost containment; declaratory judgment, subrogation and any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the Policy(ies).

2. **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3. **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4. **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program.  We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

5. **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies) as stated in the Specifications.

6. **Deductible Premium** is the amount paid by You to Us for the Program.

7. **Default** occurs when

    a. You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,

    b. You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You,

    c. You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8. **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9. **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us.  How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges** shall include, but are not limited to, additional taxes, additional Premium Surcharges, additional premium and loss assessments, and administrative, statutory or court-ordered fines or penalties not the result of Our negligence.  Other Special Charges shall also include any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this Agreement.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies).  Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** include current, new or modified premium surcharges and assessments levied by federal, state, city, municipal or other governmental agencies or as required by regulation or statute which are due and adjusted as stated in the Specifications.  New premium surcharges and assessments are those levied after the Specifications Effective Date.  Modified premium surcharges and assessments are those whose rate or computation base changes after the Specifications Effective Date.

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds.  The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable.  With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim.  The ULAE may be charged to You either by applying:  (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

## F. Payments Due

The payments under this Program and the dates these amounts become due are stated in the Specifications.  Each party to the Agreement agrees to remit all payments so that they are received on or before the due date.  If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date.  You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

## G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications. We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually. The formula for adjustment of the Loss Fund amount is stated in the Specifications.

## H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us. The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank").

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

      The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement. Collateral requirements will be reviewed periodically and We reserve the right to adjust Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it Is adjusted are stated in the Specifications. You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

      Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, delivery of other than New York Insurance Department approved wording, etc. shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

      If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

      If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC. You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15)

days prior to its expiration date, whichever is sooner.  The LOC must be in the form provided by Us.

3. Draws on Collateral

In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

a. Any amount that is due or may become due under this Agreement;

b. Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

c. Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4. Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required.  You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

**I.   Audit**

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies).  The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

**J.   Invalidity and Severability**

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision.  The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

**K.   Non-Waiver of Rights**

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement.  The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

**L.   Changes in this Agreement**

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

**M.   Offset**

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

### N. Reliance on Others

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should be considered to constitute such advice. You further represent that if accounting advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

### O. Arbitration

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1. Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA. The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2. A panel shall be made up of three arbitrators. Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3. If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4. If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association. At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5. Unless the parties under this Agreement agree otherwise, arbitration shall take place in Schaumburg, Illinois.

6. The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement. Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages. Confirmation of the award may be entered in any court having jurisdiction.

7. Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses). Each party shall pay its own costs of counsel and witnesses.

### P. Termination

This Agreement will terminate by mutual written consent. We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled. Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination. It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the

right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, the Agreement will follow the cancellation provisions of the Policy(ies), subject to the minimum amounts for the Deductible Premium and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your financial condition, We may, at Our option, terminate the financing portion of the Program. The amount immediately due and payable to Us will be determined by Us using either of the following options: (1) all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; or, (2) the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

**Q. Governing Law And Jurisdiction**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its choice of law doctrine.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**

By: _____

Title: _E V P / C F O_

Witness: _____

Date: _2 / 17 / 12_

**AMERICAN ZURICH INSURANCE COMPANY**

By: _____

Title: _____

Witness: _____

Date: _2 / 6 / 2012_

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT**
**BETWEEN**
**PACIFIC STATES INDUSTRIES, INC.**
**AND**
**AMERICAN ZURICH INSURANCE COMPANY ("AZIC")**

**Specifications Effective Date: January 01, 2012**

**A.  Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|---|---|---|---|
| WC | AZIC | WC 82 98 292 - 08 | 01/01/2013 |

**B.  Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1.  The first $750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2.  The first $750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3.  The first $750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4.  The first $750,000under EL coverage arising out of occupational disease payable to each affected employee.

5.  With respect to 1through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

    ALAE is included within the Deductible Amount under the Policy and is reimbursed to Us by You up to the Deductible Amount.  We pay the ALAE excess of the Deductible Amount.

**C.  Deductible Premium**

You are obligated to pay Us Deductible Premium.  The Deductible Premium deposit and installment(s), as applicable, are payable to Us as stated in each Deductible Policy.  The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill.  In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll including stop gap | $2.219409 per $100 | 11,850,000 | $263,000 | $263,000 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

   a. The WC Terrorism Premium is not included in the WC premium or the WC rate stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only.  CAT Premium will be adjusted by Us at the time We issue the premium audit bill.  CAT Premium is not included in the WC premium or the WC rate stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of $3,800,000.

2. The Aggregate Deductible will be adjusted by Us at a rate of $32.067510 per $100 of audited payroll including stop gap at the time we issue the premium audit bill.

3. In no event will the Aggregate Deductible be less than $3,800,000.

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or Incurred Losses within the Deductible Amount plus applicable Incurred ALAE should the Loss Billings convert, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for LCF and LBAs on Paid Losses within the Deductible Amount plus applicable Paid ALAE, or Incurred Losses within the Deductible Amount plus applicable Incurred ALAE should the Loss Billings convert, is in addition to the Aggregate Deductible amount.  Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount.

**F. Loss Based Assessments (LBAs)**
You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until all losses have been paid or We suspend Loss Billings.

| State | Rate |
|-------|--------|
| AL | 0.0066 |
| DC | 0.1570 |
| ID | 0.0190 |
| KS | 0.0350 |
| LA | 0.0750 |
| ME | 0.0090 |
| MI | 0.0056 |
| PA | 0.0001 |
| USL&H | 0.0670 |

### G.  Unallocated Loss Adjustment Expense (ULAE)

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing |
|---|---|---|
| WC/EL | 1.1000 | Paid Loss & Paid ALAE |

### H.  Loss Billings

You are obligated to pay Us all Loss Billings.

You will be billed monthly following the effective date of the Deductible Policy, for the following:

1.  Paid Losses within the Deductible Amount plus applicable Paid ALAE paid during the month,
2.  less Recoveries within the Deductible Amount(s) credited during the month,
3.  times the LCF,
4.  plus WC Paid Losses within the Deductible Amount paid during the month times the state LBA.

Loss Billing payments will be withdrawn from Your bank account by Us as authorized by You under the Electronic Funds Transfer (EFT) Agreement.  Each Loss Billing transaction will take place on the 15th of the month to reimburse Us for the prior month's Losses.  If the 15th is a non-business day, we will withdraw the funds on the following normal business day.

We will not delay the drawing out of funds due to an individual Claim or Loss dispute.  We will either withdraw all Losses not in dispute or withdraw the full amount and any reconciliation of the Losses that may be necessary will be recognized and adjusted for in the subsequent month's transaction.

Loss Billings shall continue until either i) We suspend billings when all losses have been paid or ii) the conversion of the Loss Billings resulting in an alternate method of payment as may be provided for in the Loss Billing Conversion section of these Specifications.

### Premium Surcharges and Other Special Charges

1.  Premium Surcharges

    You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium. This sum is payable to Us as stated in the Policy.

    You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy.  Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

    You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2. Other Special Charges

You are obligated to pay Us for Other Special Charges.  You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law.   We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.  You will be billed based upon the information provided.

**I.  Loss Fund**

| Loss Fund on Hand | $ 94,664 |
|---|---|
| Adjustment: | $ 0 |
| Required/Amended Loss Fund amount: | $94,664 |

1. You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2. Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.  We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

   a. Paid Losses within the Deductible Amounts and applicable Paid ALAE for 12 months prior to the adjustment date,
   b. times the LCF,
   c. plus WC Paid Losses within the Deductible Amount times the applicable state LBA,
   d. divided by 12 equals the monthly average payment,
   e. monthly average payment times 1.0 equals the adjusted Loss Fund,
   f. Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3. At the time of each Loss Fund adjustment, payment by You must be deposited to the EFT due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings.  When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

**J.  Collateral**

| Collateral on hand: | $2,600,000 |
|---|---|
| Adjustment: | $ (150,000) |
| Required/Amended Collateral amount: | $2,450,000 |

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1. Incurred Losses within the Deductible Amounts plus applicable Incurred ALAE,
2. times the applicable LDF,
3. times the LCF,
4. plus the applicable LBA,
6. less the sum of amounts billed by Us for Loss Billings.

For the Policy stated in these Specifications, LDFs used by Us to compute Your Required/Amended Collateral obligation will be determined by Us, at our sole discretion, at the time of each Collateral adjustment.

## K. Notices

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc.
Attn: Mr. Austin L. Vanderhoof – Executive VP

Address:   2 W Santa Clara Street, 9th FL
San Jose, CA 95113-1807

Telephone:408 271 7900

Telefax:   408 271 7911


If to Us:   American Zurich Insurance Company

Attn: Sean Terry Account Manager & VP

Address:   100 High St. 13th Floor

Boston, MA 02110


Telephone:617-570-8924

The parties have caused the Specifications, effective January 01, 2012 to be signed by their duly authorized representatives and witnessed.

PACIFIC STATES INDUSTRIES, INC.

By: _____

Title: _____EVP/CFO_____

Witness: _____

Date: ____2/17/12_____

AMERICAN ZURICH INSURANCE COMPANY

By: _____

Title: ___Vice President_____

Witness: _____

Date: ___1/26/2012_____

EXHIBIT "C"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2013, between Pacific States Industries, Inc. (referred to as "You" and "Your") and American Zurich Insurance Company referred to as "We," "Us" and "Our").

## TERMS AND CONDITIONS

### A. Purpose of the Agreement

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

### B. Scope of the Agreement

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications.  Each part of the Agreement will be signed by both parties.  The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program and supersedes any Deductible endorsements to the Policy(ies), prior communications, negotiations, participating plans or letters of election.

### C. Program Description

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications.  You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

You assume the risk within the Deductible Amount(s) and We accept the risk transfer excess of the Deductible Amount(s) and the Aggregate Deductible, if applicable, up to the limits of liability under the Policy(ies).  You pay Us for Our assumption of this obligation and for Our expenses.

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral.  The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

### D. Program Structure

The Program has two primary, independent components: (1) the insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

If You Default, We may, at Our option, terminate the financing arrangements under the Program. This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

### E. Definitions

1. **Allocated Loss Adjustment Expense ("ALAE")** is an expense directly allocable to a specific claim and shall include but not be limited to all Supplementary payments as defined under the Policy(ies); all court costs, fees and expenses; all costs, fees and expenses for all attorneys, witnesses, experts, depositions, reported or recorded statements, summonses, service of process, legal transcripts or testimony, copies of any public records; alternative dispute resolution; interest; investigative services, non-employee adjusters, medical examinations, autopsies, medical cost containment; declaratory judgment, subrogation and any other fees, costs or expenses reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or a loss under the Policy(ies).

2. **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3. **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4. **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program. We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

5. **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies) as stated in the Specifications.

6. **Deductible Premium** is the amount paid by You to Us for the Program.

7. **Default** occurs when
   a. You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,
   b. You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You,
   c. You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8. **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9. **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us. How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges** shall include, but are not limited to, additional taxes, additional Premium Surcharges, additional premium and loss assessments, and administrative, statutory or court-ordered fines or penalties not the result of Our negligence. Other Special Charges shall also include any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this Agreement.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies).  Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** include current, new or modified premium surcharges and assessments levied by federal, state, city, municipal or other governmental agencies or as required by regulation or statute which are due and adjusted as stated in the Specifications.  New premium surcharges and assessments are those levied after the Specifications Effective Date.  Modified premium surcharges and assessments are those whose rate or computation base changes after the Specifications Effective Date.

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds.  The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable.  With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim.  The ULAE may be charged to You either by applying:  (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

## F.  Payments Due

The payments under this Program and the dates these amounts become due are stated in the Specifications.  Each party to the Agreement agrees to remit all payments so that they are received on or before the due date.  If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date.  You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

## G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications.  We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually.  The formula for adjustment of the Loss Fund amount is stated in the Specifications.

## H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us.  The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank").

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

   The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement.  Collateral requirements will be reviewed periodically and We reserve the right to adjust  Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it is adjusted are stated in the Specifications.  You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

   Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, delivery of other than New York Insurance Department approved wording, etc. shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

   If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

   If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC.  You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15)

days prior to its expiration date, whichever is sooner.  The LOC must be in the form provided by Us.

3. Draws on Collateral

In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

a. Any amount that is due or may become due under this Agreement;

b. Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

c. Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4. Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required.  You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

## I. Audit

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies).  The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

## J. Invalidity and Severability

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision.  The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

## K. Non-Waiver of Rights

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement.  The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

## L. Changes in this Agreement

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

## M. Offset

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

## N.  Reliance on Others

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should be considered to constitute such advice.  You further represent that if accounting advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

## O.  Arbitration

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1.  Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA.  The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2.  A panel shall be made up of three arbitrators.  Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3.  If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4.  If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association.  At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5.  Unless the parties under this Agreement agree otherwise, arbitration shall take place in Schaumburg, Illinois.

6.  The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement.  Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages. Confirmation of the award may be entered in any court having jurisdiction.

7.  Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses).  Each party shall pay its own costs of counsel and witnesses.

## P.  Termination

This Agreement will terminate by mutual written consent.  We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled.  Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination.  It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the

right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, the Agreement will follow the cancellation provisions of the Policy(ies), subject to the minimum amounts for the Deductible Premium and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your financial condition, We may, at Our option, terminate the financing portion of the Program.  The amount immediately due and payable to Us will be determined by Us using either of the following options:  (1) all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; or, (2)  the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

## Q. Governing Law And Jurisdiction

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its choice of law doctrine.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

| PACIFIC STATES INDUSTRIES, INC. | AMERICAN ZURICH INSURANCE COMPANY |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Witness: _____ | Witness: _____ |
| Date: _____ | Date: _____ |

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT**
**BETWEEN**
**PACIFIC STATES INDUSTRIES**
**AND**
**AMERICAN ZURICH INSURANCE COMPANY ("AZIC")**

**Specifications Effective Date: January 1st, 2013**

**A. Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|---|---|---|---|
| WC | AZIC | WC 82 98292 09 | 01/01/2014 |

**B. Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1. The first $750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2. The first $750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3. The first $750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4. The first $750,000 under EL coverage arising out of occupational disease payable to each affected employee.

5. With respect to 1 through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

   ALAE is included within the Deductible Amount(s) under the Policy(ies) and is reimbursed to Us by You up to the Deductible Amount.  We pay the ALAE excess of the Deductible Amount.

**C. Deductible Premium**

You are obligated to pay Us Deductible Premium.  The Deductible Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill.  In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll excluding stop gap | $2.627899 per $100 | $11,850,000 | $311,406 | $311,406 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

    a. The WC Terrorism Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only.  CAT Premium will be adjusted by Us at the time We issue the premium audit bill.  CAT Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of $3,800,000.

2. The Aggregate Deductible will be adjusted by Us at a rate of $32.067510 per $100 of audited payroll excluding stop gap at the time we issue the premium audit bill.

3. In no event will the Aggregate Deductible be less than $3,800,000.

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or Incurred Losses within the Deductible Amount plus applicable Incurred ALAE should the Loss Billings convert, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for the sum of the LCF plus LBAs on Paid Losses and applicable Paid ALAE, or Incurred Losses and applicable Incurred ALAE should the Loss Billings convert is in addition to the Aggregate Deductible amount.  Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount.

**F. Loss Based Assessments (LBAs)**

You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below.  LBA charges within the Loss Billings shall continue until We suspend Loss Billings when all losses have been paid.

| State | Rate |
|-------|--------|
| AL | 0.0066 |
| DC | 0.1770 |
| ID | 0.0180 |
| KS | 0.0480 |
| LA | 0.0750 |
| ME | 0.0080 |
| MI | 0.0130 |

| NE | 0.0040 |
|---|---|
| PA | 0.0001 |
| USL&HW* | 0.0670 |

*\* and extensions, as applicable, to be billed annually or as determined by Us.*

## G. Unallocated Loss Adjustment Expense (ULAE)

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing |
|---|---|---|
| WC/EL | 1.10 | Paid Loss & Paid ALAE |

## H. Loss Billings

You are obligated to pay Us all Loss Billings.

You will be billed monthly following the effective date of the Deductible Policy(ies), for the following:

1. Paid Losses within the Deductible Amount(s) plus applicable Paid ALAE paid during the month,
2. less Recoveries within the Deductible Amount(s) credited during the month,
3. times the LCF,
4. plus WC Paid Losses within the Deductible Amount(s) paid during the month times the state LBA.

Loss Billings shall continue until either i) We suspend billings when all losses have been paid or ii) the conversion of the Loss Billings resulting in an alternate method of payment as may be provided for in the Loss Billing Conversion section of these Specifications.

## I. Premium Surcharges and Other Special Charges

1. Premium Surcharges

   You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium. This sum is payable to Us as stated in the Policy(ies).

   You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy(ies).   Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

   You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2. Other Special Charges

You are obligated to pay Us for Other Special Charges. You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law. We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof. You will be billed based upon the information provided.

**J. Loss Fund**

| | |
|---|---|
| Loss Fund on Hand | $84,000 |
| Adjustment: | $0 |
| Required/Amended Loss Fund amount: | $84,000 |

1. You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2. Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date. We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

   a. Paid Losses within the Deductible Amount(s) and applicable Paid ALAE for 12 months prior to the adjustment date,
   b. times the LCF,
   c. plus WC Paid Losses within the Deductible Amount(s) times the applicable state LBA,
   d. divided by 12 equals the monthly average payment,
   e. monthly average payment times 1 equals the adjusted Loss Fund,
   f. Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3. At the time of each Loss Fund adjustment, payment by You will be due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings. When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

**K. Collateral**

| | |
|---|---|
| Collateral on hand: | $2,450,000 |
| Adjustment: | $0 |
| Required/Amended Collateral amount: | $2,450,000 |

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date. Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1. Incurred Losses within the Deductible Amount(s) plus applicable Incurred ALAE,
2. times the applicable LDF,
3. times the LCF,
4. plus the applicable LBA,
5. less the sum of amounts billed by Us for Loss Billings.

For the Policy(ies) stated in these Specifications, LDFs used by Us to compute Your Required/Amended Collateral obligation will be determined by Us, at our sole discretion, at the time of each Collateral adjustment.

**L.   Notices**

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc.
                   Attn: Mr. Austin L. Vanderhoof – CFO
Address:    2 W Santa Clara Street, 9th Floor
                   San Jose, CA 95113 - 1807


Telephone:408 271 7900

Telefax:    408 271 7911

If to Us:    American Zurich Insurance Company

                   Attn: Jason Ross – Zurich Global Corporate Casualty

Address:    100  High Street – 13th floor
                   Boston, MA 02110

Telephone:617 570 8974


The parties have caused the Specifications, effective January 1, 2013 to be signed by their duly authorized representatives and witnessed.


**PACIFIC STATES INDUSTRIES, INC.**          **AMERICAN ZURICH INSURANCE COMPANY**

By: _____          By: _____

Title: _____          Title: _____

Witness: _____          Witness: _____

Date: _____          Date: _____

EXHIBIT "D"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2014, between Pacific States Industries, Inc. (referred to as "You" and "Your") and American Zurich Insurance Company referred to as "We," "Us" and "Our").

### TERMS AND CONDITIONS

**A. Purpose of the Agreement**

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

**B. Scope of the Agreement**

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications. Each part of the Agreement will be signed by both parties. The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program. By executing this agreement, you acknowledge that we provided you with a "NOTICE OF DISPUTE RESOLUTION TERMS TO BE INCLUDED IN CERTAIN AGREEMENTS PURSUANT TO CALIFORNIA INSURANCE CODE SECTION 11658.5" and that the terms of this Agreement reflect the final agreement to You and Us relating to the resolution of disputes under this Agreement.

**C. Program Description**

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications. You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral. The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

**D. Program Structure**

The Program has two primary, independent components: (1) the insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

As set out below in "Termination", if You Default, We may, at Our option, terminate the financing arrangements under the Program. This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

E. **Definitions**

1.  **Allocated Loss Adjustment Expense ("ALAE")** shall be defined in the Policy(ies).

2.  **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3.  **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4.  **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program.

5.  **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies).

6.  **Deductible Premium** is the amount paid by You to Us for the Program as set forth in the Policy(ies) and, for ease of reference, this/these amount(s) are restated in the Specifications..

7.  **Default** occurs when

    a.  You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,

    b.  You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You, or

    c.  You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8.  **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9.  **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us.  How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges** are (a) additional taxes, premium surcharges and premium and loss assessments incurred or paid by Us in connection with the Policy(ies); (b) administrative, statutory or court-ordered fines or penalties incurred or paid by Us in connection with the Policy(ies) not the result of Our negligence; (c) any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this

Agreement; and (d) any other charge, loss or expense paid or incurred by Us in connection with the Policy(ies) that does not constitute a loss payment under the Policy(ies), ALAE, Loss Based Assessments, Premium Tax, Premium Surcharges or payments to a TPA.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies). Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** are surcharges and assessments by federal, state, city, municipal or other governmental agencies or required by regulation or statute, that are levied on the basis of premiums and include new premium surcharges and assessments that are levied after the Specifications Effective Date and premium surcharges and assessments for which the rate or computation base changes after the Specifications Effective Date

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds. The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable. With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim. The ULAE may be charged to You either by applying: (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

## F. Payments Due

The payments under this Program and the dates these amounts become due are stated in the Specifications. Each party to the Agreement agrees to remit all payments so that they are received on or before the due date. If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date. You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

### G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications. We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually. The formula for adjustment of the Loss Fund amount is stated in the Specifications.

### H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us. The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank"). The LOC shall comply substantially with the requirements for LOCs under New York Insurance Regulation 133 and shall be acceptable to Us. We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

      The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement. Collateral requirements will be reviewed periodically and We reserve the right to adjust Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it is adjusted are stated in the Specifications. You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

      Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, or changes in New York Insurance Regulation 133 shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

      If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

      If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC. You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15) days prior to its expiration date, whichever is sooner. The LOC must be in the form provided by Us.

3. Draws on Collateral

   In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement

between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

    a.  Any amount that is due or may become due under this Agreement;

    b.  Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

    c.  Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4.  Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required.  You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

**I.  Audit**

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies).  The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

**J.  Invalidity and Severability**

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision.  The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

**K.  Non-Waiver of Rights**

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement.  The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

**L.  Changes in this Agreement**

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

**M.  Offset**

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

**N.  Reliance on Others**

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should  be considered to constitute such advice.  You further represent that if accounting

advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

**O.  Arbitration**

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1.  Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA.  The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2.  A panel shall be made up of three arbitrators.  Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3.  If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4.  If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association.  At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5.  Arbitration shall take place in Schaumburg, Illinois for "California Employers" as defined in CIC §11658.5(d), place to be negotiated pursuant to CIC §11658.5.

6.  The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement.  Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages.  Confirmation of the award may be entered in any court having jurisdiction.

7.  Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses).  Each party shall pay its own costs of counsel and witnesses.

**P.  Termination**

This Agreement will terminate by mutual written consent.  We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled.   Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination.  It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, (a) the Agreement will follow the cancellation provisions of the Policy(ies), and (b) the calculation of the applicable Program elements, including but not limited to the minimum amounts for the Deductible Premium,

Terrorism Premium, CAT Premium, and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your ownership or financial condition, or if one of more of the Policy(ies) stated in the Specifications is canceled, We may, at Our option, terminate the financing portion of the Program. The amount immediately due and payable to Us will be determined by Us using all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; in addition to the foregoing if termination is because of Your failure to pay any amount or provide any Collateral required under this Agreement, We may instead require, at Our option, payment of the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

## Q. Governing Law And Jurisdiction

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York for "California employers" as defined in CIC *§11658.5*, state as agreed by the parties pursuant to said Section without regard to its choice of law doctrine.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

PACIFIC STATES INDUSTRIES, INC.          AMERICAN ZURICH INSURANCE COMPANY

By: _____          By: _____

Title: _____CFO_____          Title: _____

Witness: _____          Witness: _____

Date: _____5.20.14_____          Date: _____

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT**
**BETWEEN**
**PACIFIC STATES INDUSTRIES, INC.**
**AND**
**AMERICAN ZURICH INSURANCE COMPANY ("AZIC")**

**Specifications Effective Date: January 1st, 2014**

**A. Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|---|---|---|---|
| WC | AZIC | WC 8298292 10 | 01/01/2015 |

**B. Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1. The first $750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2. The first $750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3. The first $750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4. The first $750,000 under EL coverage arising out of occupational disease payable to each affected employee.

5. With respect to 1 through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

   ALAE is included within the Deductible Amount(s) under the Policy(ies) and is reimbursed to Us by You up to the Deductible Amount. We pay the ALAE excess of the Deductible Amount.

**C. Deductible Premium**

You are obligated to pay Us Deductible Premium. The Deductible Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill. In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll excluding stop gap | $2.787705 per $100 | $13,352,200 | $372,220 | $372,220 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

   a. The WC Terrorism Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only. CAT Premium will be adjusted by Us at the time We issue the premium audit bill. CAT Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of $4,280,000.

2. The Aggregate Deductible will be adjusted by Us at a rate of $32.054642 per $100 of audited payroll excluding stop gap at the time we issue the premium audit bill.

3. In no event will the Aggregate Deductible be less than $4,280,000.

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or upon conversion, Incurred Losses within the Deductible Amount plus applicable Incurred ALAE, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for LCF on Paid Losses within the Loss Limit and applicable Paid ALAE, or Incurred Losses and applicable Incurred ALAE should the Loss Billings convert, plus LBAs, is in addition to the Aggregate Deductible amount. Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount [or upon completion of a close out as set forth in these Specifications.

**F. Loss Based Assessments (LBAs)**

You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until We suspend Loss Billings when all losses have been paid or upon completion of a close out as set forth in these Specifications.

| State | Rate |
|---|---|
| AK | 0.0600 |
| AL | 0.0069 |
| DC | 0.1270 |
| DE | 0.0430 |
| ID | 0.0170 |
| KS | 0.0350 |
| LA | 0.0760 |
| ME | 0.0090 |
| MI | 0.0140 |
| USL&HW* | 0.0670 |

* and extensions, as applicable

**G. Unallocated Loss Adjustment Expense (ULAE)**

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing | Amount other than Deductible Amount |
|---|---|---|---|
| WC/EL | 1.09 | Paid Loss & Paid ALAE | $500,000 |

**H. Loss Billings**

You are obligated to pay Us all Loss Billings.

You will be billed monthly following the effective date of the Deductible Policy(ies), for the following:

1. Paid Losses within the Deductible Amount(s) plus applicable Paid ALAE paid during the month,
2. less Recoveries within the Deductible Amount(s) credited during the month,
3. times the LCF,
4. plus WC Paid Losses within the Deductible Amount(s) paid during the month times the state LBA.

Loss Billings shall continue until either i) We suspend billings when all losses have been paid or ii) the conversion of the Loss Billings resulting in an alternate method of payment as may be provided for in the Loss Billing Conversion section of these Specifications.]

**I.   Premium Surcharges and Other Special Charges**

1.   Premium Surcharges

You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium.  This sum is payable to Us as stated in the Policy(ies.)

You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy(ies).   Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2.   Other Special Charges

You are obligated to pay Us for Other Special Charges.  You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law. We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.  You will be billed based upon the information provided.

**J.   Loss Fund**

| Adjustment: | $0 |
|-------------|-----|

1.   You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2.   Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.  We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

   a.   Paid Losses within the Deductible Amount(s) and applicable Paid ALAE for 12 months prior to the adjustment date,
   b.   times the LCF,
   c.   plus WC Paid Losses within the Deductible Amount(s) times the applicable state LBA,
   d.   divided by 12 equals the monthly average payment,
   e.   monthly average payment times 1 equals the adjusted Loss Fund,
   f.   Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3.   At the time of each Loss Fund adjustment, payment by You will be due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings. When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

**K.  Collateral**

| Adjustment: | $350,000 |
|---|---|

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1.  Incurred Losses within the Deductible Amount(s) plus applicable Incurred ALAE,
2.  times the applicable LDF,
3.  times the LCF,
4.  plus the applicable LBA,
5.  less the sum of amounts billed by Us for Loss Billings.

For the Policy(ies) stated in these Specifications, LDFs used by Us to compute Your Required/Amended Collateral obligation will be determined by Us, at our sole discretion, at the time of each Collateral adjustment.

**L.   Notices**

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc.
             Attn: Mr. Austin L. Vanderhoof – CFO
Address:    PO Box 1300
             Morgan Hill, CA 95038

Telephone: 408 271 7900

Telefax:    408 271 7911

If to Us:    American Zurich Insurance Company

             Attn: Jason Ross – Zurich Global Corporate Casualty

Address:   100 High Street – 13th floor
             Boston, MA 02110

Telephone: 617 570 8974

The parties have caused the Specifications, effective January 1st, 2014 to be signed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**

By: _____

Title: SECRETARY

Witness: _____

Date: 9·10·14

**AMERICAN ZURICH INSURANCE COMPANY**

By: _____

Title: _____

Witness: _____

Date: _____

# EXHIBIT "E"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2015, between Pacific States Industries, Inc. (referred to as "You" and "Your") and American Zurich Insurance Company referred to as "We," "Us" and "Our").

## TERMS AND CONDITIONS

### A.  Purpose of the Agreement

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

### B.  Scope of the Agreement

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications.  Each part of the Agreement will be signed by both parties.  The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program.  By executing this agreement, you acknowledge that we provided you with a "NOTICE OF DISPUTE RESOLUTION TERMS TO BE INCLUDED IN CERTAIN AGREEMENTS PURSUANT TO CALIFORNIA INSURANCE CODE SECTION 11658.5" and that the terms of this Agreement reflect the final agreement to You and Us relating to the resolution of disputes under this Agreement.

### C.  Program Description

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications.  You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral.  The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

### D.  Program Structure

The Program has two primary, independent components: (1) the insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

As set out below in "Termination", if You Default, We may, at Our option, terminate the financing arrangements under the Program.  This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

### E. Definitions

1. **Allocated Loss Adjustment Expense ("ALAE")** shall be defined in the Policy(ies).

2. **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3. **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4. **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program.

5. **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies).

6. **Deductible Premium** is the amount paid by You to Us for the Program as set forth in the Policy(ies) and, for ease of reference, this/these amount(s) are restated in the Specifications..

7. **Default** occurs when

   a. You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,

   b. You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You, or

   c. You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8. **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9. **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us.  How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges**  are (a) additional taxes, premium surcharges and premium and loss assessments incurred or paid by Us in connection with the Policy(ies); (b) administrative, statutory or court-ordered fines or penalties incurred or paid by Us in connection with the Policy(ies) not the result of Our negligence; (c) any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this

Agreement; and (d) any other charge, loss or expense paid or incurred by Us in connection with the Policy(ies) that does not constitute a loss payment under the Policy(ies), ALAE, Loss Based Assessments, Premium Tax, Premium Surcharges or payments to a TPA.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies). Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** are surcharges and assessments by federal, state, city, municipal or other governmental agencies or required by regulation or statute, that are levied on the basis of premiums and include new premium surcharges and assessments that are levied after the Specifications Effective Date and premium surcharges and assessments for which the rate or computation base changes after the Specifications Effective Date

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds. The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable. With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim. The ULAE may be charged to You either by applying: (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

## F. Payments Due

The payments under this Program and the dates these amounts become due are stated in the Specifications. Each party to the Agreement agrees to remit all payments so that they are received on or before the due date. If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date. You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

### G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications.  We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually.  The formula for adjustment of the Loss Fund amount is stated in the Specifications.

### H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us.  The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank").  The LOC shall comply substantially with the requirements for LOCs under New York Insurance Regulation 133 and shall be acceptable to Us.  We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

      The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement.  Collateral requirements will be reviewed periodically and We reserve the right to adjust Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it is adjusted are stated in the Specifications.  You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

      Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, or changes in  New York Insurance Regulation 133  shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

      If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

      If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC.  You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15) days prior to its expiration date, whichever is sooner.  The LOC must be in the form provided by Us.

3. Draws on Collateral

   In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement

between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

    a.  Any amount that is due or may become due under this Agreement;

    b.  Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

    c.  Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4. Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required.  You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

## I.  Audit

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies).  The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

## J.  Invalidity and Severability

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision.  The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

## K.  Non-Waiver of Rights

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement.  The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

## L.  Changes in this Agreement

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

## M.  Offset

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

## N.  Reliance on Others

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should  be considered to constitute such advice.  You further represent that if accounting

advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

## O. Arbitration

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1. Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA. The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2. A panel shall be made up of three arbitrators. Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3. If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4. If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association. At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5. Arbitration shall take place in Schaumburg, Illinois for "California Employers" as defined in CIC §11658.5(d), place to be negotiated pursuant to CIC §11658.5.

6. The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement. Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages. Confirmation of the award may be entered in any court having jurisdiction.

7. Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses). Each party shall pay its own costs of counsel and witnesses.

## P. Termination

This Agreement will terminate by mutual written consent. We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled. Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination. It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, (a) the Agreement will follow the cancellation provisions of the Policy(ies), and (b) the calculation of the applicable Program elements, including but not limited to the minimum amounts for the Deductible Premium,

Terrorism Premium, CAT Premium, and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your ownership or financial condition, or if one of more of the Policy(ies) stated in the Specifications is canceled, We may, at Our option, terminate the financing portion of the Program.  The amount immediately due and payable to Us will be determined by Us using all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; in addition to the foregoing if termination is because of Your failure to pay any amount or provide any Collateral required under this Agreement, We may instead require, at Our option, payment of the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

**Q. Governing Law And Jurisdiction**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York for "California employers" as defined in CIC *§11658.5*, state as agreed by the parties pursuant to said Section without regard to its choice of law doctrine.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**          **AMERICAN ZURICH INSURANCE COMPANY**

By: _____          By: _____

Title: _____          Title: _____

Witness: _____          Witness: _____

Date: _____          Date: _____

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT
BETWEEN
PACIFIC STATES INDUSTRIES, INC.
AND
AMERICAN ZURICH INSURANCE COMPANY ("AZIC")**

**Specifications Effective Date: January 1st, 2015**

**A. Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|-------------|---------|---------------|-----------------|
| WC | AZIC | WC 8298292 11 | 01/01/2016 |

**B. Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1. The first $750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2. The first $750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3. The first $750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4. The first $750,000 under EL coverage arising out of occupational disease payable to each affected employee.

5. With respect to 1 through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

   ALAE is included within the Deductible Amount(s) under the Policy(ies) and is reimbursed to Us by You up to the Deductible Amount.  We pay the ALAE excess of the Deductible Amount.

**C. Deductible Premium**

You are obligated to pay Us Deductible Premium.  The Deductible Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill. In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|-------------|---------------|------|--------------------|--------------------|-----------------|
| WC/EL | Payroll excluding stop gap | $2.759831 per $100 | $16,379,732 | $452,053 | 452,053 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

   a. The WC Terrorism Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only.  CAT Premium will be adjusted by Us at the time We issue the premium audit bill.  CAT Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of $5,250,000.

2. The Aggregate Deductible will be adjusted by Us at a rate of $32.051806 per $100 of audited payroll excluding stop gap at the time we issue the premium audit bill.

3. In no event will the Aggregate Deductible be less than $5,250,000.

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or upon conversion, Incurred Losses within the Deductible Amount plus applicable Incurred ALAE, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for LCF on Paid Losses within the Loss Limit and applicable Paid ALAE, or Incurred Losses and applicable Incurred ALAE should the Loss Billings convert, plus LBAs, is in addition to the Aggregate Deductible amount.  Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount [or upon completion of a close out as set forth in these Specifications.

**F. Loss Based Assessments (LBAs)**
You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until We suspend Loss Billings when all losses have been paid or upon completion of a close out as set forth in these Specifications.

| State | Rate |
|-------|------|
| AK | 0.0600 |
| AL | 0.0068 |
| DC | 0.1380 |
| DE | 0.0390 |
| ID | 0.0190 |
| KS | 0.0300 |
| LA | 0.0760 |
| ME | 0.0090 |
| NE | 0.0030 |
| MS | 0.0155 |
| MI | 0.0140 |
| USL&HW* | 0.0670 |

* and extensions, as applicable

**G. Unallocated Loss Adjustment Expense (ULAE)**

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing | Amount other than Deductible Amount |
|-------------|-----|-------------------|-------------------------------------|
| WC/EL | 1.09 | Paid Loss & Paid ALAE | $500,000 |

**H. Loss Billings**

You are obligated to pay Us all Loss Billings.

You will be billed monthly following the effective date of the Deductible Policy(ies), for the following:

1. Paid Losses within the Deductible Amount(s) plus applicable Paid ALAE paid during the month,
2. less Recoveries within the Deductible Amount(s) credited during the month,
3. times the LCF,
4. plus WC Paid Losses within the Deductible Amount(s) paid during the month times the state LBA.

Loss Billings shall continue until either i) We suspend billings when all losses have been paid or ii) the conversion of the Loss Billings resulting in an alternate method of payment as may be provided for in the Loss Billing Conversion section of these Specifications.]

**I.  Premium Surcharges and Other Special Charges**

1.  Premium Surcharges

You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium.  This sum is payable to Us as stated in the Policy(ies).

You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy(ies).   Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2.  Other Special Charges

You are obligated to pay Us for Other Special Charges.  You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law. We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.  You will be billed based upon the information provided.

**J.  Loss Fund**

| Adjustment: | $0 |
|---|---|

1.  You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2.  Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.  We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

   a.  Paid Losses within the Deductible Amount(s) and applicable Paid ALAE for 12 months prior to the adjustment date,
   b.  times the LCF,
   c.  plus WC Paid Losses within the Deductible Amount(s) times the applicable state LBA,
   d.  divided by 12 equals the monthly average payment,
   e.  monthly average payment times 1 equals the adjusted Loss Fund,
   f.  Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3.  At the time of each Loss Fund adjustment, payment by You will be due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings. When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

**K. Collateral**

| Adjustment: | $100,000 |
|---|---|

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1.  Incurred Losses within the Deductible Amount(s) plus applicable Incurred ALAE,
2.  times the applicable LDF,
3.  times the LCF,
4.  plus the applicable LBA,
5.  less the sum of amounts billed by Us for Loss Billings.

For the Policy(ies) stated in these Specifications, LDFs used by Us to compute Your Required/Amended Collateral obligation will be determined by Us, at our sole discretion, at the time of each Collateral adjustment.

**L.  Notices**

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc.
             Attn: Mr. Austin L. Vanderhoof – CFO
Address:     PO Box 1300
             Morgan Hill, CA 95038

Telephone: 408 271 7900

Telefax:   408 271 7911

If to Us:    American Zurich Insurance Company

             Attn: Patrick Wickles – Zurich Global Corporate Casualty

Address:     100 High Street – 13th floor
             Boston, MA 02110

Telephone: 617 570 8800

The parties have caused the Specifications, effective January 1st, 2015 to be signed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**   **AMERICAN ZURICH INSURANCE COMPANY**

By: _____   By: _____

Title: _____   Title: _____

Witness: _____   Witness: _____

Date: _____   Date: _____

# EXHIBIT "F"

## PAID DEDUCTIBLE AGREEMENT

This Agreement, effective on the 1st day of January, 2016, between Pacific States Industries (referred to as "You" and "Your") and American Zurich Insurance Company referred to as "We," "Us" and "Our").

## TERMS AND CONDITIONS

### A. Purpose of the Agreement

The purpose of this Agreement is to outline (a) the scope, description and structure of the Deductible Program ("Program") You and We have entered into and (b) the duties and obligations of each party with respect to this Program.

### B. Scope of the Agreement

The Policy(ies) for each line of business issued by the applicable insurance company, including all endorsements, extensions, renewals and/or rewrites, subject to this Agreement are stated in the Specifications.

This Agreement has two parts: Terms and Conditions and Specifications. Each part of the Agreement will be signed by both parties. The Agreement term is continuous and will be amended for each Program change by adding new Specifications, effective on the date of the change, and signed by both parties.

This Agreement governs the structure and operation of and the duties and obligations of each party to this Program. By executing this agreement, you acknowledge that we provided you with a "NOTICE OF DISPUTE RESOLUTION TERMS TO BE INCLUDED IN CERTAIN AGREEMENTS PURSUANT TO CALIFORNIA INSURANCE CODE SECTION 11658.5" and that the terms of this Agreement reflect the final agreement to You and Us relating to the resolution of disputes under this Agreement.

### C. Program Description

Under the Program, We handle and pay the claims presented in accordance with the provisions of the Policy(ies) and bill You for the claim payments within the Deductible Amount(s), plus related expenses and assessments, as stated in the Specifications. You agree to and shall remit to Us all amounts when due, as stated in the Specifications. We hold a Loss Fund in an amount stated in the Specifications so that We do not use Our funds to pay Your obligations within the Deductible Amount(s).

As a consequence of providing You with a risk financing arrangement under this Program, We assume a financial risk for which We may require Collateral. The initial amount of the Collateral and how the amount may be adjusted is stated in the Specifications.

### D. Program Structure

The Program has two primary, independent components: (1) the Insurance coverage provided under the Policy(ies); and (2) the risk financing arrangement provided under the Program.

As set out below in "Termination", if You Default, We may, at Our option, terminate the financing arrangements under the Program. This will result in all of Your financial obligations under the Program becoming immediately due and payable to Us.

E. **Definitions**

1. **Allocated Loss Adjustment Expense ("ALAE")** shall be defined in the Policy(ies).

2. **ALAE Reserve** is Our evaluation of unpaid ALAE under the Policy(ies).

3. **Aggregate Deductible** is the greatest amount You are obligated to reimburse Us under the Deductible Policy(ies) which shall apply as stated in the Specifications at each Loss Billing for the Program term stated in the Specifications.

4. **Collateral** is a financial instrument provided by You to secure the deferral of Your financial obligations under the Program.

5. **Deductible Amount(s)** is the amount You are obligated to reimburse Us for each occurrence, accident or claim under the Policy(ies).

6. **Deductible Premium** is the amount paid by You to Us for the Program as set forth in the Policy(ies) and, for ease of reference, this/these amount(s) are restated in the Specifications..

7. **Default** occurs when

   a. You fail to pay any amount, including but not limited to the initial Loss Fund amount and subsequent adjustments, when it is due under any Agreement or any policy issued by Us to You,

   b. You file a petition in bankruptcy, a declaration of insolvency or an action or proceeding for dissolution is filed by or against You; a receiver or trustee is appointed for You; You execute a workout agreement; You make an assignment for the benefit of creditors; or any other proceeding or arrangement of a similar nature is instituted by or against You, or

   c. You fail to provide the initial, adjusted, amendments to or replacement Collateral as required in this Agreement.

8. **Due on Demand** is when a payment is due Us at the time the bill is presented to You.

9. **Incurred ALAE ("IALAE")** is the Paid ALAE plus the ALAE Reserve under the Policy(ies).

10. **Incurred Loss ("IL")** is a Paid Loss plus a Loss Reserve under the Policy(ies).

11. **Loss Based Assessment ("LBA")** is a state charge levied against losses.

12. **Loss Development Factor ("LDF")** is a multiplier set by Us at Our sole discretion to evaluate (a) claims and related ALAE that have occurred but have not as yet been reported to You or to Us; and, (b) anticipated changes in Incurred Loss and Incurred ALAE for claims that have been previously reported to Us.  How and when the LDF is applied shall be as stated in the Specifications.

13. **Loss Fund** is a non-interest bearing account where Your funds are held by Us to provide for the payment of Your obligations within the Deductible Amount(s) under the Policy(ies) prior to Your reimbursing Us.

14. **Loss Reserve** is Our evaluation of the unpaid portion of a claim that has been previously reported to Us under the Policy(ies) and does not include ALAE Reserve.

15. **Other Special Charges** are (a) additional taxes, premium surcharges and premium and loss assessments incurred or paid by Us in connection with the Policy(ies); (b) administrative, statutory or court-ordered fines or penalties incurred or paid by Us in connection with the Policy(ies) not the result of Our negligence; (c) any expenses We incur to collect from You amounts past due and to enforce any of the provisions of this Agreement, except as provided for in Section O of the Terms and Conditions of this

Agreement; and (d) any other charge, loss or expense paid or incurred by Us in connection with the Policy(ies) that does not constitute a loss payment under the Policy(ies), ALAE, Loss Based Assessments, Premium Tax, Premium Surcharges or payments to a TPA.

16. **Paid ALAE** is a payment made by Us for ALAE under the Policy(ies).

17. **Paid Loss** is a payment made by Us for a claim under the Policy(ies). Paid Loss does not include ALAE.

18. **Policy(ies)** shall mean those Policy(ies) stated in Section A of the Specifications.

19. **Premium Surcharges** are surcharges and assessments by federal, state, city, municipal or other governmental agencies or required by regulation or statute, that are levied on the basis of premiums and include new premium surcharges and assessments that are levied after the Specifications Effective Date and premium surcharges and assessments for which the rate or computation base changes after the Specifications Effective Date

20. **Premium Tax** includes state taxes and assessments that may be charged against the full state Standard Premium or the Deductible Premium.

21. **Recoveries** are that portion of any payment made under the Policy(ies) that We recover from anyone liable for the loss or from any workers compensation funds. The amount We recover will be applied as follows: (a) first, to any payments made by Us in excess of the Deductible Amounts; and, (b) then the remainder, if any, will be applied to reduce the Deductible Amounts reimbursable by You.

22. **Standard Premium** for Workers' Compensation and Employers' Liability (WC/EL) is calculated in accordance with the National Council on Compensation Insurance and/or specific state rules using Our manual rates times the exposure times the experience modification times schedule rating modification and/or deviations, if applicable. With respect to insurance coverages other than WC/EL, standard premium includes the premium We would charge for the Program term subject to the terms of the rating plan.

23. **Unallocated Loss Adjustment Expense ("ULAE")** includes expenses that are not directly allocated to a specific claim. The ULAE may be charged to You either by applying: (a) a **Loss Conversion Factor ("LCF")** that is a factor applied to the Paid or Incurred Loss, plus Paid or Incurred ALAE; or (b) a **Claim Handling Fee ("CHF")** that is a dollar amount charged per reported claimant, as stated in the Specifications.

F. **Payments Due**

The payments under this Program and the dates these amounts become due are stated in the Specifications. Each party to the Agreement agrees to remit all payments so that they are received on or before the due date. If any amount is payable and a specific due date is not stated, twenty (20) days from the date of billing will be the due date. You and each named insured stated in the Policy(ies) shall be jointly and severally responsible for the obligations under this Agreement.

In the event all or part of a payment due under the Program is in dispute:

1. The undisputed portion of the payment will be remitted in accordance with the terms of this Agreement.

2. A written notice stating the amount and explaining the reason for the dispute will be sent to the address stated in the Specifications on or before the payment due date.

Both parties agree to attempt to resolve any dispute within sixty (60) days after the date of the notice.

### G. Loss Fund

The initial amount of the Loss Fund is stated in the Specifications. We reserve the right to adjust the amount of the Loss Fund at any time, but at a minimum, annually. The formula for adjustment of the Loss Fund amount is stated in the Specifications.

### H. Collateral

1. Required Letter of Credit

   On or before the Agreement effective date, You shall give Us a clean, unconditional, irrevocable Letter of Credit ("LOC") with an automatic renewal term of twelve (12) months in the form provided by Us. The LOC must be from a bank which is and remains acceptable to Us and is and remains listed on the most current National Association of Insurance Commissioners ("NAIC") list of Acceptable Domestic Banks or U.S. Branches or U.S. Agencies of Acceptable Foreign Institutions ("Qualified Bank"). The LOC shall comply substantially with the requirements for LOCs under New York Insurance Regulation 133 and shall be acceptable to Us. We have provided You with the required form and parameters for the type of Collateral both parties have agreed will be used.

2. Computation, Adjustment, Amendment and Replacement of LOC

   a. Amounts

      The LOC amount shall be in an amount sufficient to secure Your financial obligations under this Agreement. Collateral requirements will be reviewed periodically and We reserve the right to adjust Collateral at any time We deem necessary to secure Your obligations to Us under the Program. The initial amount of the LOC and how it is adjusted are stated in the Specifications. You shall provide Us with an amendment to the LOC for any increase or decrease in the amount required within thirty (30) days of Our request.

   b. Amendments

      Wording amendments requested by Us as a result of a bank error, a policy issuing company change, regulatory changes, or changes in New York Insurance Regulation 133 shall be provided by You within sixty (60) days of Our written or verbal request or not less than fifteen (15) days prior to the LOC expiration date, whichever is sooner.

   c. Nonrenewal of LOC

      If the issuing bank notifies Us of nonrenewal of the LOC in not less than thirty (30) days prior to its expiration You shall provide Us with a replacement LOC in an equal or adjusted amount not less than fifteen (15) days prior to its expiration date.

   d. Issuing Bank Approval

      If the issuing bank is no longer acceptable to Us or a Qualified Bank, You shall provide Us with a replacement LOC in an equal or adjusted amount from a bank that is acceptable to Us and that is approved by the NAIC. You shall provide Us with the replacement LOC within thirty (30) days of Our request or not less than fifteen (15) days prior to its expiration date, whichever is sooner. The LOC must be in the form provided by Us.

3. Draws on Collateral

   In the event of a Default, We reserve the right to a partial or full draw on any Collateral provided by You under the provisions of this Agreement or any other agreement

between You and Us to pay any amount that is due or may become due as respects any one or more of the following obligations:

   a.  Any amount that is due or may become due under this Agreement;

   b.  Any amount due under any other agreement You, or any other named insured under the Policy(ies), have or may have with Us or any of Our affiliates.

   c.  Any amount that is due under any policy of insurance issued to You by Us or any of Our affiliates.

4.  Surrender of LOC

Your duty to provide Collateral will continue until We determine that the Collateral under this Agreement is no longer required. You understand and agree that this duty may continue even if this Agreement is terminated as provided for in Termination section of this Agreement or is otherwise cancelled.

## I.  Audit

An audit for the Policy(ies) stated in the Specifications will be conducted in accordance with the provisions of the Policy(ies). The adjustable elements of the Program will be adjusted based on the audited exposures as stated in the Specifications.

## J.  Invalidity and Severability

It is agreed that if any provision of this Agreement is found to be invalid or unenforceable by a governmental authority or court of law, all the other provisions of this Agreement shall remain valid and enforceable as if the Agreement did not contain the invalid or unenforceable provision. The invalid or unenforceable provision shall be amended to the minimum extent necessary to cure the invalid or unenforceable element and to preserve the original intent.

## K.  Non-Waiver of Rights

Failure by either party to enforce any provision of this Agreement shall not be interpreted as a waiver of such provision or any other provision or any existing or future rights or privileges under this Agreement. The terms and conditions of this Agreement may be strictly enforced at any time despite any past or subsequent failure to do so by either party.

## L.  Changes in this Agreement

This Agreement shall not be waived, changed or assigned except by an Addendum, signed by a duly authorized representative of each party to this Agreement.

## M.  Offset

The parties under this Agreement each reserve the right to offset any undisputed balance due from one party to the other under this or any other Agreement entered into between Us, except as prohibited by law.

## N.  Reliance on Others

You understand, acknowledge, and confirm that We did not offer advice to You concerning the proper financial, accounting, or tax treatment for the Policy(ies) and nothing herein should be considered to constitute such advice. You further represent that if accounting

advice, tax advice, or other expert professional assistance is required, You will rely on Your own accountant, adviser, counsel, or other similar competent professional with expertise in the required area.

### O. Arbitration

Any dispute arising out of the interpretation, performance or alleged breach of this Agreement, shall be settled by binding arbitration administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules and the following procedures:

1. Written notice requesting arbitration will be sent by the initiating party via certified or registered mail, return receipt requested, to the other party with the required copies to the AAA. The notice shall state the nature of the dispute, the amount involved, if any, and the remedy sought.

2. A panel shall be made up of three arbitrators. Each party shall select one arbitrator and the two selected arbitrators shall select an impartial third arbitrator with a commercial liability insurance background who shall preside at the hearing.

3. If either party fails to appoint its arbitrator within thirty (30) days of the delivery of the request, the other party shall send notice by certified or registered mail of its intention to appoint a second arbitrator and may do so within ten days of the appointment notice date.

4. If the two arbitrators do not select the third arbitrator within thirty (30) days of their appointment, each arbitrator shall select three candidates, or a smaller number as agreed to by the two arbitrators, from a list of qualified candidates with a commercial liability insurance background provided by the American Arbitration Association. At the request of the two arbitrators, the American Arbitration Association shall select the third arbitrator from the list of candidates submitted.

5. Arbitration shall take place in Schaumburg, Illinois.

6. The arbitrators shall not limit, expand or modify the terms of this Agreement nor award damages in excess of compensatory damages under this Agreement. Such excess damages would include without limitation any form of fine or multiple, punitive or exemplary damages and each party waives any claim to such excess damages. Confirmation of the award may be entered in any court having jurisdiction.

7. Each party shall pay the expense of its own arbitrator and equally pay the expenses of the third arbitrator and any other expenses of the arbitration proceeding (except witnesses). Each party shall pay its own costs of counsel and witnesses.

### P. Termination

This Agreement will terminate by mutual written consent. We also reserve the right to terminate this Agreement if (1) there is a material change in Your ownership or (2) one or more of the Policy(ies) stated in the Specifications is canceled. Despite the termination of the Agreement, You are still liable for all Your obligations under this Agreement incurred up to the date of termination. It is understood and agreed by both parties that if billings are suspended at any point in time because all payments have been made, We still reserve the right to bill You at a future date for any and all claims subsequently reported, together with related expenses, provided the Aggregate Deductible, if any, has not been exhausted.

In the event of a mid-term termination of the Program, (a) the Agreement will follow the cancellation provisions of the Policy(ies), and (b) the calculation of the applicable Program elements, including but not limited to the minimum amounts for the Deductible Premium,

Terrorism Premium, CAT Premium, and the Aggregate Deductible, if applicable, stated in the Specifications.

In the event of a Default or a material change in Your ownership or financial condition, or if one of more of the Policy(ies) stated in the Specifications is canceled, We may, at Our option, terminate the financing portion of the Program.  The amount immediately due and payable to Us will be determined by Us using all of Your obligations under this Agreement calculated using the most recent incurred loss valuation times the applicable LDF determined by Us at Our sole discretion at the time of termination; in addition to the foregoing if termination is because of Your failure to pay any amount or provide any Collateral required under this Agreement, We may instead require, at Our option, payment of the full Standard Premium by converting the Program to a guaranteed cost rating plan using Our manual rates in effect as of the Policy(ies) effective date.

## Q. Governing Law And Jurisdiction

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

The parties have caused this Agreement, effective as of the date first written above, to be executed by their duly authorized representatives and witnessed.

(Signature Page Follows)

**PACFIC STATES INDUSTRIES, INC**

By: _Curtd Vann_

Title: _V. P._

Witness: _Nora Banks_

Date: _3.29 16_

**AMERICAN ZURICH INSURANCE COMPANY**

By: _____

Title: _____

Witness: _____

Date: _____

SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT
BETWEEN

PACIFIC STATES INDUSTRIES, INC. AND

AMERICAN ZURICH INSURANCE COMPANY ("AZIC")
AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY ("AG")
ZURICH AMERICAN INSURANCE COMPANY ("ZAIC")
ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS ("ZAICI")

**Specifications Effective Date January 1st, 2016**

**A.  Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|---|---|---|---|
| WC | AZIC | WC 8298292 12 | 1/1/2017 |

**B.  Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1.  The first $ 750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2.  The first $ 750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3.  The first $ 750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4.  The first $ 750,000 under EL coverage arising out of occupational disease payable to each affected employee.

5.  With respect to 1through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

    ALAE is included within the Deductible Amount(s) under the Policy(ies) and is reimbursed to Us by You up to the Deductible Amount.  We pay the ALAE excess of the Deductible Amount.

**C.  Deductible Premium**

You are obligated to pay Us Deductible Premium.  The Deductible Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill.

In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll excludingstop gap | $2.411221 per $100 | $19,853,921 | $478,722 | $478,222 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

   a. The WC Terrorism Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only. CAT Premium will be adjusted by Us at the time We issue the premium audit bill. CAT Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of $6,250,000.

2. The Aggregate Deductible will be adjusted by Us at a rate of $31.479927 per $100 of audited payroll excluding stop gap.

3. In no event will the Aggregate Deductible be less than $ 6,250,000.

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or upon conversion, Incurred Losses within the Deductible Amount plus applicable Incurred ALAE, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for LCF on Paid Losses within the Loss Limit and applicable Paid ALAE, or Incurred Losses and applicable Incurred ALAE should the Loss Billings convert, plus LBAs, is in addition to the Aggregate Deductible amount. Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount [or upon completion of a close out as set forth in these Specifications.

**F. Loss Based Assessments (LBAs)**

You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until We suspend Loss Billings when all losses have been paid [or upon completion of a close out as set forth in these Specifications

| State | Rate |
|-------|------|
| AK | .0600 |
| AL | .0068 |
| DC | .1382 |
| DE | .0394 |
| ID | .0180 |
| KS | .0504 |
| LA | .0760 |
| ME | .0090 |
| MI | .0150 |
| MS | .0155 |
| NE | .0020 |
| USL&HW* | .0670 |

* and extensions, as applicable

## G.  Unallocated Loss Adjustment Expense (ULAE)

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing | Amount other than Deductible Amount |
|-------------|-----|-------------------|-------------------------------------|
| WC/EL | 1.085 | Paid Loss & Paid ALAE | $500,000 |

## H.  Loss Billings

You are obligated to pay Us all Loss Billings.

You will be billed monthly on each following the effective date of the Deductible Policy(ies), for the following:

1. Paid Losses within the Deductible Amount(s) plus applicable Paid ALAE paid during the month
2. less Recoveries within the Deductible Amount(s) credited during the month
3. times the LCF
4. plus WC Paid Losses within the Deductible Amount(s) paid during the month times the state LBA

## I.  Premium Surcharges and Other Special Charges

1. Premium Surcharges

   You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium. This sum is payable to Us as stated in the Policy(ies.)

   You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy(ies).   Premium Surcharges are subject to change without prior notice.  Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

   You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.  The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2. Other Special Charges

   You are obligated to pay Us for Other Special Charges.  You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law. We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.  You will be billed based upon the information provided.

## J.  Loss Fund

| Additional Loss Fund: | $0 |
|---|---|

1. You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2. Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.  We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

   a.  Paid Losses within the Deductible Amount(s) and applicable Paid ALAE for 12 months prior to the adjustment date,
   b.  times the LCF
   c.  plus WC Paid Losses within the Deductible Amount(s) times the applicable state LBA,
   d.  divided by 12 equals the monthly average payment,
   e.  monthly average payment times 1 equals the adjusted Loss Fund,
   f.  Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3. At the time of each Loss Fund adjustment, payment by You will be due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings. When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

## K.  Collateral

| Collateral on hand: | $2,900,000 |
|---|---|
| Adjustment: | $500,000 |
| Required/Amended Collateral amount: | $3,400,000 |

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1. Incurred Losses within the Deductible Amount(s) plus applicable Incurred ALAE,
2. times the applicable LDF,
3. times the LCF
4. plus the applicable LBA,
5. less the sum of amounts billed by Us for Loss Billings.

L.  **Notices**

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:  Pacific States Industries, Inc
            Attn: Mr Austin L. Vanderhoof - CFO
Address:    PO Box 1300
            Morgan Hill, CA 95038


Telephone: 408 271 7900

Telefax:    408 271 7911

If to Us:   American Zurich Insurance Company
            Attn: Dan Ovadia – Zurich Global Corporate
Address:    *100 High Street – 13th Floor*
            *Boston, MA 02110*


Telephone: 617 570 8800




The parties have caused the Specifications, effective January 1st, 2016 to be signed by their duly authorized representatives and witnessed.

PACIFIC STATES INDUSTRIES, INC.

By _____

Title: _____V.P._____

Witness: _____

Date: _____3 29.16_____

AMERICAN ZURICH INSURANCE COMPANY

By: _____

Title: _____

Witness: _____

Date: _____

# EXHIBIT "G"

**SPECIFICATIONS TO PAID DEDUCTIBLE AGREEMENT
BETWEEN**

**PACIFIC STATES INDUSTRIES, INC. AND**

**AMERICAN ZURICH INSURANCE COMPANY ("AZIC")
AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY ("AG")
ZURICH AMERICAN INSURANCE COMPANY ("ZAIC")
ZURICH AMERICAN INSURANCE COMPANY OF ILLINOIS ("ZAICI")**

**Specifications Effective Date January 1st, 2017**

**A. Applicable Policy(ies)**

| Policy(ies) | Company | Policy Number | Expiration Date |
|-------------|---------|---------------|-----------------|
| WC | AZIC | WC 8298292 13 | 1/1/2018 |

**B. Deductible Amount(s)**

The following are the Deductible Amount(s) applying to all losses, claims, suits, actions or other proceedings with respect to the coverages provided under the Policy(ies):

1. The first $ 750,000 under Workers' Compensation ("WC") coverage arising out of each accident involving one or more employees.

2. The first $ 750,000 under WC coverage arising out of occupational disease payable to each affected employee.

3. The first $ 750,000 under Employers' Liability ("EL") coverage arising out of each accident involving one or more employees.

4. The first $ 750,000 under EL coverage arising out of occupational disease payable to each affected employee.

5. With respect to 1 through 4 above, the amount of ALAE that You are obligated to pay Us will be determined as follows:

   ALAE is included within the Deductible Amount(s) under the Policy(ies) and is reimbursed to Us by You up to the Deductible Amount. We pay the ALAE excess of the Deductible Amount.

**C. Deductible Premium**

You are obligated to pay Us Deductible Premium. The Deductible Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Deductible Policy. The Deductible Premium stated below is an estimated amount which is subject to adjustment. Adjusted Deductible Premium due is payable to Us at the time We issue the premium audit bill.

In no event will the amount of the Deductible Premium be less than the Minimum Premium stated below.

| Policy(ies) | Exposure Base | Rate | Estimated Exposure | Deductible Premium | Minimum Premium |
|---|---|---|---|---|---|
| WC/EL | Payroll excludingstop gap | $2.284630 per $100 | $21,658,386 | $494,814 | $494,814 |

**D. Terrorism Premium And Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program)**

1. You are obligated to pay Us a Terrorism Premium charge for risk of loss resulting from terrorism and Catastrophe Premium (including other than Certified Acts of Terrorism as defined by the Terrorism Risk Insurance Program) and hereinafter referred to as CAT Premium.

2. Terrorism Premium and CAT Premium deposit(s) and installment(s), as applicable, are payable to Us as stated in each Policy.

3. Terrorism Premium will be adjusted by Us at the time We issue the premium audit bill.

    a. The WC Terrorism Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

4. CAT Premium applies with respect to WC Policy(ies) only. CAT Premium will be adjusted by Us at the time We issue the premium audit bill. CAT Premium is not included in the WC premium(s) or the WC rate(s) stated elsewhere in these Specifications and is subject to audit.

**E. Aggregate Deductible**

1. The Aggregate Deductible is an estimated amount of **$6,850,000.**

2. The Aggregate Deductible will be adjusted by Us at a rate of **$31.6274727** per $100 of audited payroll excluding stop gap.

3. In no event will the Aggregate Deductible be less than **$ 6,850,000.**

4. The most You are obligated to pay Us for the sum of Paid Losses within the Deductible Amount plus applicable Paid ALAE, or upon conversion, Incurred Losses within the Deductible Amount plus applicable Incurred ALAE, shall be no greater than the Aggregate Deductible.

5. Your obligation to pay Us for LCF on Paid Losses within the Loss Limit and applicable Paid ALAE, or Incurred Losses and applicable Incurred ALAE should the Loss Billings convert, plus LBAs, is in addition to the Aggregate Deductible amount. Loss Billings for these elements will cease once You have paid the Aggregate Deductible amount [or upon completion of a close out as set forth in these Specifications.

**F. Loss Based Assessments (LBAs)**

You are obligated to pay Us LBAs.  At each Loss Billing, actual LBA charges will be computed by Us by multiplying WC Losses within the Deductible Amount(s) by the state LBA rate below. LBA charges within the Loss Billings shall continue until We suspend Loss Billings when all losses have been paid [or upon completion of a close out as set forth in these Specifications

| State | Rate |
|-------|------|
| AK | .0600 |
| AL | .0068 |
| DC | .1382 |
| DE | .0394 |
| ID | .0180 |
| KS | .0504 |
| LA | .0760 |
| ME | .0090 |
| MI | .0150 |
| MS | .0155 |
| NE | .0020 |
| USL&HW* | .0670 |

* and extensions, as applicable

## G. Unallocated Loss Adjustment Expense (ULAE)

At each Loss Billing, We will bill You the following LCF(s):

| Policy(ies) | LCF | Paid Loss Billing | Amount other than Deductible Amount |
|-------------|-----|-------------------|-------------------------------------|
| WC/EL | 1.085 | Paid Loss & Paid ALAE | $500,000 |

## H. Loss Billings

You are obligated to pay Us all Loss Billings.

You will be billed monthly on each following the effective date of the Deductible Policy(ies), for the following:

1. Paid Losses within the Deductible Amount(s) plus applicable Paid ALAE paid during the month
2. less Recoveries within the Deductible Amount(s) credited during the month
3. times the LCF
4. plus WC Paid Losses within the Deductible Amount(s) paid during the month times the state LBA

**I.   Premium Surcharges and Other Special Charges**

1.   Premium Surcharges

You are obligated to pay Us Premium Surcharges in addition to the Deposit Premium. This sum is payable to Us as stated in the Policy(ies.)

You are obligated to pay Us for Premium Surcharges which apply in any jurisdiction in which exposure exists or where exposure develops under the Policy(ies).   Premium Surcharges are subject to change without prior notice.   Premium Surcharges will be billed by Us based upon rates according to applicable regulatory or statutory requirements.

You will be billed and are obligated to pay Us for additional Premium Surcharges which are due at the time We issue the premium audit billing.   The applicable Premium Surcharges may apply to, but are not limited to, the following: Deductible Premium, Standard Premium, Excess Premium, Terrorism Premium, CAT Premium and audited exposures.

2.   Other Special Charges

You are obligated to pay Us for Other Special Charges.   You will be billed for Other Special Charges at the time We issue the premium audit billing unless otherwise required by law. We will provide You with information about the purpose of the charges and, as applicable, the amount of the charge and the application thereof.   You will be billed based upon the information provided.

**J.   Loss Fund**

| Additional Loss Fund: | $0 |
|---|---|

1.   You are obligated to provide the Required/Amended Loss Fund amount stated above which is due on or before the Specifications Effective Date.

2.   Adjustment of the Loss Fund will be computed at a minimum annually after the Specifications Effective Date.   We may adjust the Loss Fund at any time We determine the amount We require is greater than the Required/Amended amount stated above. Adjustments will be calculated and billed as follows:

a.   Paid Losses within the Deductible Amount(s) and applicable Paid ALAE for 12 months prior to the adjustment date,

b.   times the LCF

c.   plus WC Paid Losses within the Deductible Amount(s) times the applicable state LBA,

d.   divided by 12 equals the monthly average payment,

e.   monthly average payment times 1 equals the adjusted Loss Fund,

f.   Required/Amended Loss Fund less Loss Fund held equals the additional or return amount due.

3.   At the time of each Loss Fund adjustment, payment by You will be due within twenty (20) days of the billing date; payment by Us will be credited to Your subsequent Loss Billings. When We have determined that We no longer require a Loss Fund, the remaining balance in the Loss Fund will be returned to You.

**K.   Collateral**

| Collateral on hand: | $3,400,000 |
|---|---|

| | |
|---|---|
| Adjustment: | $375,000 |
| Required/Amended Collateral amount: | $3,775,000 |

The Required/Amended Collateral amount stated above is due on or before the Specifications Effective Date.  Collateral requirements will be reviewed periodically and We reserve the right to require additional Collateral at any time We deem necessary to secure Your obligations to Us under the Program.

The adjustment of the Collateral will include, but will not be limited to:

1.  Incurred Losses within the Deductible Amount(s) plus applicable Incurred ALAE,
2.  times the applicable LDF,
3.  times the LCF
4.  plus the applicable LBA,
5.  less the sum of amounts billed by Us for Loss Billings.

**L.   Notices**

All notices, letters or other communications required under this Agreement shall be in writing and addressed as follows:

If to You:   Pacific States Industries, Inc
             Attn: Mr Austin L. Vanderhoof - CFO
Address:   PO Box 1300
             Morgan Hill, CA 95038


Telephone: 408 271 7900

Telefax:    408 271 7911

If to Us:    American Zurich Insurance Company

             Attn: Dan Ovadia – Zurich Global Corporate

Address:   *100 High Street – 13ᵗʰ Floor*
             *Boston, MA 02110*


Telephone: 617 570 8800




The parties have caused the Specifications, effective **January 1ˢᵗ, 2017** to be signed by their duly authorized representatives and witnessed.

**PACIFIC STATES INDUSTRIES, INC.**

By: _____

Title: _____EVP/CFO_____

Witness: _____

Date: _____3.1.17_____

**AMERICAN ZURICH INSURANCE COMPANY**

By: _____

Title: _____

Witness: _____

Date: _____

# EXHIBIT "H"

# BRESSLER AMERY ROSS

A PROFESSIONAL CORPORATION

325 Columbia Turnpike  •  Suite 301  •  Florham Park, NJ 07932
P. O. Box 1980  •  Morristown, NJ 07962
973.514.1200  •  fax 973.514.1660
www.bressler.com

Samuel J. Thomas
Principal

direct:  973-660-4455
sthomas@bressler.com

June 26, 2018

*Via Federal Express*

Austin L. Vanderhoof
Chief Financial Officer
Pacific States Industries, Inc.
10 Madrone Hill
Morgan Hill, CA  95037

>  **Re:**  **Collateral Obligations of Pacific States Industries, Inc.**
> **Policy No. WC8298292**
> **Program Effective Dates:  01/01/2004 to 01/01/2017**

Dear Mr. Vanderhoof:

This firm represents American Zurich Insurance Company and certain affiliates ("Zurich"), and we have been retained to facilitate the fulfillment of Pacific States Industries, Inc.'s ("Pacific") collateral obligations for the above insurance program.  As such, please direct all future communications regarding this matter to my attention.

Pacific, as you know, is presently required to provide additional collateral in the amount of $1,078,819 by amendment to the existing letter of credit ("LOC").  It is our understanding that Pacific and its insurance broker, Risk Strategies Company ("RSC"), acknowledged Zurich's demand for the additional collateral but questioned the amount and requested a reduction.  Because the collateral need was properly calculated in conformity with the insurance program terms, Zurich properly denied Pacific's  request.  Despite this, Pacific has neither posted the additional collateral nor provided a substantive reason for Zurich to reconsider.   Zurich, therefore, was left with no choice but to assume that Pacific does not intend to honor its obligations.

Zurich retained our firm to provide Pacific with a final opportunity to post the additional collateral and, if necessary, to initiate arbitration in accordance with the terms of the insurance program.  Please be advised that Pacific must provide Zurich with additional collateral of $1,078,819 before the close of business on **Friday, July 6, 2018**, in order to avoid formal

June 26, 2018
Page 2

proceedings.   Moreover, if this matter proceeds to arbitration, Zurich will claim the entire outstanding collateral, interest, attorney's fees and litigation costs.

Please call my office to confirm that Pacific will post the required collateral by the deadline.  The LOC amendment must be delivered to Zurich no later than **Friday, July 6, 2018**, to the following address:

> Zurich American Insurance Company
> 1299 Zurich Way
> Attn: Collateral Department, F5 - W
> Schaumburg, IL 60196-1056
> NAC.Collateral@zurichna.com

We look forward to hearing from you.  Thank you for your anticipated cooperation.

Very truly yours,

Samuel J. Thomas/mmd

Samuel J. Thomas

EY/mmd

cc:   Fred Cannon, Risk Strategies Company / via e-mail
Amber Olivan, Risk Strategies Company / via e-mail